Pages 1 - 122

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA, JUDGE

IN RE ROUNDUP PRODUCTS              )
LIABILITY LITIGATION                )  Case No. 16-md-02741 VC
_____ )
                                       San Francisco, California
                                       Wednesday, May 22, 2019


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                        WEITZ & LUXENBERG, P.C.
                        700 Broadway
                        New York, New York 10003
                   BY:  **ROBIN L. GREENWALD, ESQ.**

                        ANDRUS ANDERSON LLP
                        7171 West Alaska Drive
                        Lakewood, Colorado 80226
                   BY:  **AIMEE WAGSTAFF, ESQ.**

                        BAUM, HEDLUND, ARISTEI, & GOLDMAN, P.C.
                        12100 Wilshire Boulevard, Suite 950
                        Los Angeles, California 90025
                   BY:  **R. BRENT WISNER, ESQ.**
                        **MICHAEL L. BAUM, ESQ.**

                        THE MILLER FIRM LLC
                        108 Railroad Avenue
                        Orange, Virginia  22960
                   BY:  **BRIAN BRAKE, ESQ.**


(Appearances continued on next page)


Reported By:   Katherine Powell Sullivan, CSR #5812, RMR, CRR
               Official Reporter - U.S. District Court

**APPEARANCES (CONTINUED):**

For Plaintiffs:

FULMER SILL PLLC
1101 N. Broadway Avenue, Suite 102
Oklahoma City, Oklahoma 73103
BY: **TARA T. TABATABAIE, ESQ.**

LAW OFFICES OF TESFAYE TSADIK
1736 Franklin Street 10th Floor
Oakland, California 94612
BY: **TESFAYE WOLDE TSADIK, ESQ.**

LUNDY, LUNDY, SOILEAU AND SOUTH, LLP
501 Broad Street
Lake Charles, Louisiana 70601
BY: **HUNTER WILLIAM LUNDY, ESQ.**
**RUDIE SOILEAU, ESQ.**

MOORE LAW GROUP, PLLC
1473 South 4th Street.
Louisville, Kentucky 40208
BY: **JENNIFER A. MOORE, ESQ.**

ANDRUS WAGSTAFF, PC
7171 West Alaska Drive
Lakewood, Colorado 80226
BY: **DAVID J. WOOL, ESQ.**

BRADY LAW GROUP
1015 Irwin Street
San Rafael, California 94901
BY: **STEVEN J. BRADY, ESQ.**

AUDET & PARTNERS, LLP
711 Van Ness Avenue, Suite 500
San Francisco, California  94102
BY: **MARK BURTON, ESQ.**

ANDRUS HOOD WAGSTAFF
1999 Broadway, Suite 4150
Denver, Colorado 80202
BY: **VANCE R. ANDRUS, ESQ.**

(Appearances continued on next page)

**APPEARANCES (CONTINUED):**

For Plaintiffs:

                  LOCKRIDGE GRINDAL NAUEN PLLP
                  100 Washington Avenue S.
                  Minneapolis, Minnesota 55401-2179
        BY: **YVONNE M. FLAHERTY, ESQ.**

                  ANDRUS WAGSTAFF PC
                  6315 Ascot Drive
                  Oakland, California 94611
        BY: **KATHRYN M. FORGIE, ESQ.**

For Defendant:

                  WILKINSON WALSH ESKOVITZ
                  2001 M Street, NW, 10th Floor
                  Washington, DC 20036
        BY: **BRIAN L. STEKLOFF, ESQ.**
             **RAKESH KILARU, ESQ.**

1  **P R O C E E D I N G S**

2  <u>**Wednesday, May 22, 2019**</u>                    <u>**10:11 a.m.**</u>

3                    **---oOo---**

4      (This transcript applies to the following cases: Ashton

5  v. Monsanto Company, 18-cv-3959; Moceri v. Monsanto Company,

6  18-cv-3558; Flynn v. Monsanto Company, 18-cv-6551; Brooks v.

7  Monsanto Company, 18-cv-7558; Angel v. Monsanto Company,

8  18-cv-5547; Smith v. Monsanto Company, 17-cv-5547; Applegate v.

9  Monsanto Company, 18-cv-3363; Boblitz v. Monsanto Company,

10  18-cv-0993; Beaudet v. Monsanto Company, 17-cv-6902; Berlin v.

11  Monsanto, Company 18-cv-0815; Ginger v. Monsanto Company,

12  18-cv-4552; Koehn v. Monsanto Company, 17-cv-5161; Edwards v.

13  Monsanto Company 17-cv-7365; Ruffin v. Monsanto Company,

14  18-cv-1085; Wiseman v. Monsanto, Company 18-cv-5495; Giglio v.

15  Monsanto Company, 18-cv-5658; Baum v. Monsanto Company,

16  19-cv-1018; Gonzales v. Monsanto Company, 19-cv-1020; Rabbers

17  v. Monsanto Company, 19-cv-1023; Rivas v. Monsanto Company,

18  19-cv-1024; Taylor v. Monsanto Company, 19-cv-1030; Kast v.

19  Monsanto Company, 19-cv-1031; Ataide v. Monsanto Company,

20  19-cv-1289; Abreu v. Monsanto Company, 19-cv-1587; Chupa v.

21  Monsanto Company, 19-cv-1589; Archambault v. Monsanto Company,

22  19-cv-1717; Conyers v. Monsanto Company 19-cv-2001.)

23                    **---oOo---**

24      **THE CLERK:**  Calling civil action C16-MD-02741, In Re

25  Roundup Products Liability Litigation.

1    Counsel, please step forward and state your appearances

2  for the record.

3    **THE COURT:**  And if one of you wants to announce

4  everybody's presence, feel free to do it that way.  Whatever

5  you prefer.

6    **MS. WAGSTAFF:**  All right.  Good morning, Your Honor.

7  Aimee Wagstaff on behalf of the plaintiffs.  Nice to see you

8  again.

9    **THE COURT:**  You too.

10    **MS. GREENWALD:**  I guess I'm going to be the emcee.

11  Robin Greenwald for the plaintiffs.  And then we've got Brian

12  Brake.  Mr. Miller had a problem getting here, so Mr. Brake is

13  sitting in his place.

14    Hunter Lundy, Yvonne Flaherty, and Tara Tabatabaie.  And

15  she is arguing the remand today.

16    **THE COURT:**  Okay.  Great.

17    **MS. GREENWALD:**  And then Tesfaye Tsadik.

18    **THE COURT:**  Hello.

19    **MS. GREENWALD:**  And then is sitting in the back,

20  Michael Baum, Brett Wisner, and then we have a bunch of others.

21  But these are the people who are speaking, Your Honor.

22    **THE COURT:**  Hi, everyone.

23    **MR. STEKLOFF:**  Good morning, Your Honor.  Brian

24  Stekloff and Rakesh Kilaru on behalf of Monsanto.

25    **THE COURT:**  Outnumbered again.  Monsanto is always

outnumbered.

Okay. Let's see. So let's put together a little list of things that we should make sure to discuss today, and maybe roughly in this order.

We have the issue of the appointment of a mediator. We have the issue of a bond. We have the motion -- what is it? -- the ninth amended motion to dismiss. This is the motion to dismiss the cases where plaintiffs never submitted a fact sheet; right?

MR. STEKLOFF: Right.

THE COURT: We have a motion to remand this California case, or these California cases. And then we have a motion to remand the Missouri case with 108 plaintiffs.

And then we have -- we have to discuss the plan for how to get all of these cases back to their home districts eventually for trial. I'll put out kind of a proposed plan. And we need to set a trial date in the Stevik case.

So that's one, two, three, four, five, six, seven items I've identified. Anything else we should be discussing?

MS. GREENWALD: Just one additional one, Your Honor, and that is taking preservation testimony of expert witnesses.

MS. WAGSTAFF: And, Your Honor, Aimee Wagstaff.

We have noticed by separate motion Mr. Giglio's case. I know if you wanted to include that in the remand plan.

THE COURT: Yeah, I was thinking of that, Mr. Giglio's

1  case as part of the discussion of the remand plan.

2          **MS. WAGSTAFF:**  Okay.

3          **THE COURT:**  And I was also thinking of severance as

4  part of the discussion of the remand plan; you know, that is,

5  severance of any multi-plaintiff cases that are otherwise here

6  properly, where there's not a motion to remand pending or

7  whatever, but that they should be severed and we should figure

8  out when and how to do that.

9          **MS. WAGSTAFF:**  Okay.  I just wanted to note that for

10  you.

11          **THE COURT:**  Anything else?

12          **MR. STEKLOFF:**  Only, so I don't forget, our post trial

13  briefs in Hardeman are due on May 31st.  We were going to seek

14  an extra 10 pages.  I think the plaintiffs agree to that.  And

15  we would agree to them having an extra 10 pages as well.

16          **MS. WAGSTAFF:**  We oppose that they're necessary, the

17  motions, but if he intends to file them, we don't oppose 10

18  extra pages.

19          **THE COURT:**  Okay.  That sounds good.

20      When is the hearing for the post trial motions?

21          **MR. KILARU:**  I don't believe it's been scheduled yet.

22  Ours is due on the 31st, and then I think -- beyond that, I

23  don't think the calendar has been set.

24          **THE COURT:**  Yours is due on the 31st of --

25          **MR. KILARU:**  May.

1       **THE COURT:**  -- May?

2       **MR. KILARU:**  Yes.

3       **THE COURT:**  Okay.  I don't know if a hearing will be

4  necessary for them, but I think we should set a hearing date.

5  And we should -- so the responses to the post trial motions

6  will be due 14 days afterwards, by operation of the rule.  Is

7  that right?

8       **MS. WAGSTAFF:**  Which puts it mid-June, probably.

9       **THE COURT:**  Okay.  I think we should take a crack at

10  setting the date now.

11       **MS. WAGSTAFF:**  Okay.

12       **THE COURT:**  Let's see here.  I think we're looking at

13  the first week of July for that.  And I know that's crunching

14  you a little bit, but because of the law clerk transition, I

15  think it's very important to do that.

16       **MS. WAGSTAFF:**  So the 4th of July holiday is on a

17  Thursday.  I assume the court will be closed that day?

18       **THE COURT:**  I assume so.  I think we should try to do

19  like the 1st or the 2nd or something like that.

20       **MS. WAGSTAFF:**  The 1st or the 2nd of July works for

21  plaintiffs.

22       **MR. STEKLOFF:**  I think the 2nd is preferable for us,

23  but we can make either day work, Your Honor.

24       **MS. MOORE:**  That's fine, Your Honor.  Jennifer Moore.

25       **THE COURT:**  I would like to ask you both to -- if

Tuesday is preferable, we could schedule that. But I would like to ask you both to keep Monday open and keep open the possibility that I'll move it to Monday, because there may be something that prevents me from doing Tuesday.

So why don't we schedule it for July 2nd, at 1:30 p.m. Let's say 1:00 p.m. July, 2nd at 1:00 p.m., with the possibility that it will be moved to Monday.

**MS. MOORE:** Thank you, Your Honor.

**MS. WAGSTAFF:** Thank you, Your Honor.

**THE COURT:** So your reply, I assume, is due seven days after the opposition; is that right?

**MR. STEKLOFF:** I would be -- I don't know, but that sounds right to me, Your Honor.

**THE COURT:** Okay. Well, regardless, let's say that your -- regardless of what the rules say, let's say that your reply is due seven days after the opposition is filed --

**MR. STEKLOFF:** Okay.

**THE COURT:** -- so that we have enough time to look at it.

**MR. STEKLOFF:** That's no problem, Your Honor.

**THE COURT:** Okay. Anything else on the -- that should be on the list to discuss today?

**MR. STEKLOFF:** Not from us, Your Honor.

**THE COURT:** Okay. So why don't we start then with the appointment of a mediator. Each side submitted three names

that they were proposing.  Both sides asked -- asked for

permission to submit those names confidentially.  I said that

that was fine.

There was no agreement between the parties.  There was no

overlap on the names that were submitted.  As I previously

indicated, if the parties were unable to agree on the

appointment of a mediator, I would go ahead and appoint one

myself.

So what I plan to do is appoint Ken Feinberg, who is on

neither side's list, so long as he's willing to do it.  And

I've had, you know, preliminary discussions with him about

that, but he and I agree that he should meet with both sides to

make sure that he's comfortable taking on the engagement.

And so I've instructed him to meet with both sides and to

report back to me in 14 days from today.  So I will require

each side to meet with him within that time frame.

At this point are you in a position to give me the primary

contact person from each side who Feinberg would communicate

with?

**MS. WAGSTAFF:**  Yes, Your Honor.  So the primary

contacts would be myself, Robin Greenwald, and Mike Miller.

**THE COURT:**  Okay.  And if there's one, who's it going

to be?

**MS. WAGSTAFF:**  He can contact me, Your Honor.

**THE COURT:**  Okay.  And what about for Monsanto?

**MR. STEKLOFF:** William Hoffman at Arnold and Porter, Your Honor.

**THE COURT:** Okay. So that's that.

The second item is that Monsanto would like to post an appeal bond of $100,334,542.62. It seemed from the case management statement that the plaintiffs may be saying that that is too low. I do not agree that that is too low.

So that is fine for -- I approve Monsanto's request to post an appeal bond in that amount and to stay enforcement pending appeal.

If you could please submit a proposed order reflecting that.

**MR. KILARU:** Of course. Thank you.

**THE COURT:** Okay. The motion to dismiss, I'm not sure if there's too much to discuss. Seems like it's almost an administrative thing at this point, but let me just pull it up.

So we have -- just to make sure that I understand it correctly, the motion to dismiss, so we have -- we have -- we've had multiple amended motions to dismiss. So we're at the ninth amended motion to dismiss, I think.

Is that the only one that we need to scrutinize?

**MR. KILARU:** No. So I believe the ninth and the eighth are the two operative ones right now. There were basically two sets of motions that were filed at different times, and they've -- those have been the ones that have been

1   sort of updated on a seriatim basis.

2           **THE COURT:**  Okay.

3           **MR. KILARU:**  So I think the seventh motion -- I'm

4   sorry, there's so many of them, but the seventh motion was the

5   one, I believe, was scheduled for today.  The ninth is the same

6   as the seventh, it just eliminates two plaintiffs where there

7   had been a stipulation of dismissal.

8           **THE COURT:**  Okay.

9           **MR. KILARU:**  So, otherwise, I think there are however

10  many plaintiffs there are remaining.  And from our perspective,

11  at least, I think it is sort of administrative at this point.

12          **THE COURT:**  Okay.  So what was the seventh is now the

13  ninth?

14          **MR. KILARU:**  Yes.

15          **THE COURT:**  And the eighth is what?

16          **MR. KILARU:**  It's a different group of plaintiffs

17  where the same arguments are being made as to, sort of, the

18  failure to file a PFS.  But I think the timing of what we filed

19  on -- we sort of just updated them on a periodic basis.  So the

20  eighth has a different group of plaintiffs but same arguments.

21          **THE COURT:**  Okay.  And so the -- I mean, there's

22  not -- as far as I can tell, there's not an opposition to this.

23  So what's the -- do you have anything to say about the motions

24  to dismiss?

25          **MR. BRAKE:**  Yes, Your Honor.  Good morning.  Brian

1  Brake for the plaintiffs.

2      What I prepared for was what Your Honor indicated we would

3  be talking about today, which is docket 3233 and docket 3084.

4      And I can tell you the plaintiffs, on those motions to

5  dismiss, which I have some comments about, would like the Court

6  to take action on.

7          THE COURT:  Well, what are -- what were the docket

8  numbers you said?

9          MR. BRAKE:  The first one Your Honor indicated we'd

10 hear today is 3233.

11         THE COURT:  What is that?

12         MR. BRAKE:  It's a motion to dismiss.

13     MR. KILARU:  I think I can clarify, which is that 3233

14 is the fifth motion.  32 -- 3084 is the fourth.  And I believe

15 the clerk had just asked us to consolidate those two into one,

16 so that's the seventh.  So the same people are involved in

17 everything.

18         THE COURT:  Okay.  So are you saying that the -- what

19 is now the ninth amended motion to dismiss, which is docket

20 number 3833, is the one that's effectively teed up for today?

21         MR. KILARU:  Yes.

22         THE COURT:  And are you saying that the eighth amended

23 motion to dismiss, docket number 3831, is not teed up for

24 discussion today?

25         MR. KILARU:  I believe that's right.  We filed it, I

think, on Monday.  It's a different group of four plaintiffs.

THE COURT:  Okay.  All right.  So, effectively, it sounds like, Mr. Brake, you are -- you're here to talk about what is now the ninth amended motion to dismiss, which is docket number 3833.

MR. BRAKE:  I believe so.  I have -- there are a total of six plaintiffs I'd like to address with the Court that I believe are in that motion.

THE COURT:  Okay.  Well, hold on a second.

MR. BRAKE:  Okay.

THE COURT:  Let me pull it up.

So I believe there are ten plaintiffs in that motion?

MR. BRAKE:  I do not have that here in front of me. I'm operating from the ones in your order.  I can tell you the names of the plaintiffs.

THE COURT:  Okay.  So what do you have to say about them?

MR. BRAKE:  What I have to say is, for plaintiff Ronald Brook, in Action 06902, that's a Miller Firm plaintiff client.

THE COURT:  He's not in this motion.

MR. BRAKE:  Okay.  Then --

THE COURT:  Oh, wait, he is.  I missed it.  I missed it.  Sorry.

MR. BRAKE:  We recently have contacted him after

multiple attempts in the past have failed to get in contact with him, and we believe we can have a modified or actual Plaintiff Fact Sheet done in 30 days.  So we'd like a 30-day extension on his Plaintiff's Fact Sheet.

      **THE COURT:**  Okay.  What's the history of -- I mean, why -- who was representing Ronald Brook?

      **MR. BRAKE:**  We represent Ronald Brook, the Miller Firm does.

      **THE COURT:**  Okay.

      **MR. BRAKE:**  And we've been trying for a long time to get ahold of him.  We only recently, on May 16th, were able to get ahold of him.  And so, based upon that, we are asking the Court to give us 30 days now to complete the Plaintiff's Fact Sheet.

      **THE COURT:**  Okay.  What else?

      **MR. BRAKE:**  The next one is DeAnna Geller.

      **THE COURT:**  Okay.

      **MR. BRAKE:**  All I can say in response to the motion to dismiss for her is that we've tried to contact her and have not been able to get ahold of her.

      **THE COURT:**  Okay.

      **MR. BRAKE:**  And then Mark Hanson, there's a stipulation filed to dismiss him with prejudice.

      **THE COURT:**  Who?

      **MR. BRAKE:**  Mark Hanson.

1          **THE COURT:** He's not on this list, and I assume the

2    reason he's not on this list --

3          **MR. KILARU:** Yes, we had agreed to stipulate. That's

4    fine.

5          **MR. BRAKE:** All right. And then the next one is Tracy

6    Magee, M-a-g-e-e.

7          **THE COURT:** Same, I assume?

8          **MR. BRAKE:** Yeah, we tried to get ahold of her

9    multiple times and have not been able to.

10          **THE COURT:** Okay. She's not on this list though.

11          **MR. KILARU:** She, I believe, should be on there.

12          **THE COURT:** She's not listed on -- I might be missing

13    it, but she's not on your ninth motion.

14          **MR. KILARU:** She was on the seventh, and I don't

15    believe she's filed anything or stipulated, so.

16          **THE COURT:** So it may have been an oversight not to

17    have her on the ninth?

18          **MR. KILARU:** It was an oversight. I apologize for

19    that.

20          **THE COURT:** That's okay. She's listed on the caption.

21    It says "This document relates to" and then includes her name,

22    but it doesn't include her -- oh, no, there she is.

23          **MR. KILARU:** She is there, okay.

24          **THE COURT:** She's on the first page.

25          **MR. KILARU:** Yeah.

1     **THE COURT:**  I didn't see that.  Okay.  All right.

2          So what did you want to say about Magee?

3     **MR. BRAKE:**  The only thing I can say is we've tried to

4  contact her without any success after multiple efforts.

5     **THE COURT:**  Okay.

6     **MR. BRAKE:**  And then the next one is Rosalita Castro.

7  A stipulation to dismiss has been filed for her, so she may not

8  be in the motion.

9     **MR. KILARU:**  Wouldn't have her.

10    **THE COURT:**  Okay.

11    **MR. BRAKE:**  And then the last one is John Otts.  I'm

12  not sure if he's in there or not.

13    **THE COURT:**  I don't think so.

14    **MR. KILARU:**  I believe he is.

15    **THE COURT:**  Oh, yes.

16    **MR. KILARU:**  First one on the next page.

17    **MR. BRAKE:**  We would ask the Court not to make a

18  ruling on that motion to dismiss because he is a plaintiff in

19  the Smith versus Monsanto case, which the Court is going to

20  rule on today about remanding and/or transferring.

21         And so I think we should wait to see how Your Honor rules

22  on that before making a disposition as to the motion to dismiss

23  for John Otts.

24    **THE COURT:**  Well, why would that matter?  I mean, if

25  he has not complied with the requirements for submitting a fact

sheet and Monsanto has complied with all the notice requirements and everything, why shouldn't he be dismissed at this point?

**MR. BRAKE:** Well, if another court is the proper court to -- for this case to be in -- for the Smith case to be in, then that would be the court to make the decision.

**THE COURT:** Is he one of the ones that -- maybe that's right. Is he one of the ones who -- I was going to ask if he was one of the plaintiffs who used Roundup for residential purposes only. But I'm guessing the answer is we don't know.

**MR. KILARU:** Well, this is the other one, I believe. This is the Missouri one, not the California ones where there's --

**THE COURT:** Oh, the Missouri.

**MR. BRAKE:** Yeah.

**THE COURT:** Oh, okay. The Missouri one.

So on that, I think the answer is that, if I remand the Missouri case, then I should not rule on the request to dismiss Otts. If I deny the motion to remand, then I dismiss Otts.

**MR. BRAKE:** Yes, sir.

**MR. KILARU:** Especially I'm not sure that's quite right, Your Honor. I don't know that the same plaintiff can have the same cause of action pending in two different courts and not prosecute one and say, well, I have the other one.

**THE COURT:** It's not that he has it pending in two

different courts; it's that it's here right now because it's been removed.  And the question is whether I have jurisdiction over it.  And if I don't have jurisdiction over it, then I send it back down to -- I send it back to Missouri and -- without ruling on the merits on anything, including without dismissing Otts' case.

**MR. KILARU:**  Right.  But I guess he's also filed a separate lawsuit here, that's properly here, that he's not prosecuting.  And I think the disposition of that --

**THE COURT:**  Oh, this is a separate --

**MR. KILARU:**  It's a different case, I believe.  It's not the same case that's here by virtue of Smith.  He's filed as a plaintiff in Smith and then also is a plaintiff here in this action.

**THE COURT:**  I see.  I see.  Oh, okay.  Right.

Well, and so if I decide that it's appropriate to remand the Missouri case, I do not have jurisdiction over that duplicative lawsuit, essentially, that he has filed because that lawsuit is properly in state court.  Or I don't know if it's properly in state court, but it should be dealt with in state court.  And then I should dismiss a separate lawsuit that he's filed here, but should it be with prejudice or without prejudice?

**MR. KILARU:**  I would think it should be with prejudice and then the -- because there's a rule -- we've sort of

established rules on what happens when you don't file a fact sheet. And then, as you say, the effect of that dismissal with prejudice, if it were to go back to Missouri -- and I think you know our position is it shouldn't, but if it were to go back to Missouri, we would have to litigate there what the effects of the dismissal with prejudice here are.

But he does have a case here that should be dismissed with prejudice under the rules we've established.

THE COURT: And I assume, Mr. Brake, same comment? You've been trying to get in touch with him and you've been unable to?

MR. BRAKE: Yes, sir.

THE COURT: Okay.

MR. BRAKE: And I'm not talking about two phone calls. I'm talking about letters, phone calls, emails, certified mail, the whole ball of wax.

THE COURT: Okay. So with respect to Brook, any objection to the request for an additional 30 days to file a fact sheet?

MR. KILARU: Yes, Your Honor, in the sense that I believe in Brook's case we're sort of several months -- at this point, well, more than several months past the point at which PFSs should have been filed.

We've provided the notices. We have been filing these motions to dismiss. So I think there have been a number of

1　instances in which it's been made clear to his lawyers and to

2　the litigation generally that he really needs to file this

3　claim.

4　　　　And I think I, as a general matter, understand the theory

5　behind getting extensions when they haven't been able to

6　contact the plaintiff, but if in every instance where we file

7　these deficiencies, then months later they say we found them, I

8　mean, I think the process is going to break down.

9　　　　**THE COURT:**　Okay.　I'll think about that.

10　　　My tentative inclination would be to say that all of

11　the -- with the exception of Brook, all of the plaintiffs'

12　cases should be dismissed with prejudice, including Otts, and

13　that I would be tentatively inclined to give Brooks another --

14　is it Brook or Brooks?

15　　　　**MR. KILARU:**　Brook.

16　　　　**MR. BRAKE:**　Brook.

17　　　　**THE COURT:**　-- Brook another 30 days.　I'll think

18　about that a little bit more.

19　　　　**MR. BRAKE:**　Thank you.

20　　　　**MR. KILARU:**　Thanks, Your Honor.

21　　　　**THE COURT:**　Okay.　Let's talk, I guess, about -- let's

22　talk first about the motion to remand the Missouri case,

23　because maybe it's a little -- maybe it's simpler.　I'm not

24　sure.

25　　　　So I will tell you I put out a question last night about

1   Section 1332(d)(11)(C).  Did I get that right?

2           **MR. BRAKE:**  Yes, sir.

3           **MR. KILARU:**  I believe so, yes.

4           **THE COURT:**  And so we've spent some time looking at it

5   since I put out that question.  And I guess my tentative view

6   of the response to the question that I put out last night is

7   that the case was transferred by the MDL panel after having

8   been removed on two grounds.  One was the federal officer

9   removal ground that I subsequently rejected in another case,

10  and the other was the CAFA ground.  Right?

11          **MR. BRAKE:**  Yes, sir.

12          **THE COURT:**  And so I think that the best answer is

13  that it was appropriate for the MDL panel to transfer the case

14  here, notwithstanding Section 1332(d)(11)(C), because there was

15  another basis for removal at the time that was not -- that

16  hadn't been deemed invalid by me yet.

17      So my -- I guess my tentative view is that it was not

18  improperly transferred and, therefore, we should just jump in

19  to whether the case should be remanded based on the arguments

20  that are made in the papers.

21      Before we jump into that, I thought I'd ask if you all had

22  any additional comments on that.

23          **MR. KILARU:**  On that, I agree with the question of

24  whether it was proper for the transfer to occur.  I think

25  there's two different senses in which it could be remanded.

One is it could be remanded back to the Eastern District of Missouri because there's not still a basis for it to be here other than MDL transfer.

And then the second would be remand back to state court. I think the latter we oppose. The former, I think, is actually the right -- is probably the right course given that you've now rejected our argument on the federal officer removal. And so it's only here to the extent it's here because of CAFA.

**THE COURT:** Well, it's only here because of CAFA, but I wonder, though, if that's -- I guess -- I think I may disagree with that. I think that it probably makes the most sense to interpret this provision, 1332(d)(11)(C), as contemplating the state of affairs at the time the transfer is -- transfer by the MDL panel is being contemplated.

So, in other words, I mean, obviously, this is an odd situation. I don't know how often it would come up, but it seems to me that the question should be whether the transfer was appropriate when it was done, not whether we would go back and do it differently in light of a subsequent ruling that I made on one of the bases for removal.

**MR. KILARU:** But I think there would still be the questions of whether there's a basis for the case to still be here. And if the only basis for the case to still be here is the MDL transfer statute, I don't think the premise that -- I take the point that you look at the point in time, but then you

have to ask why is the case here and does it make sense for it to remain here?

And if the only basis is something that's statutorily foreclosed, I would think that would be a basis for saying it actually now has to go back because I rejected that argument.

And I think there was a Darvocet case in front of the JPML in -- I think it was in 2013.

**THE COURT:** Say that again.

**MR. KILARU:** It's Darvocet, D-a-r-v-o-c-e-t.

**THE COURT:** Okay.

**MR. KILARU:** So there's sort of a long history of that case, but the first opinion in that case that I think is relevant is -- it's at 939 F.Supp.2d 1376. And that addressed the question that you opened the discussion with, which is, if there's two bases for transfer, one is MDL and one is not, is it okay to transfer it? And they said yes, if there's another basis.

**THE COURT:** I think the precise way to say it is if there are two bases for removal --

**MR. KILARU:** Yes, yes.

**THE COURT:** -- and then the panel is considering transferring, it's appropriate to transfer if one of the bases for removal was something other than CAFA.

**MR. KILARU:** Yes, that's right.

As the case followed on, it turned out, similar to here,

if I have it correct, that the other grounds for removal, the courts rejected those. So the only thing left was CAFA as the basis for sending it over.

And there was then a question of what to do with the case. And it was briefed, and I believe that there had been some indication from the JPML that the plan was going to be to actually send the case back to the transferor federal court.

But the issue then mooted out because, basically, the MDL was winding down, so the Court said we don't really need to address this. So that, to me, at least suggests it's an open question.

I think if you look at what is the basis for the case remaining here, the only basis for it being here is now CAFA. And CAFA would say that it can't be here under the statute you quoted. So we would think that sending it back to Eastern District of Missouri would be the right course.

THE COURT: So I guess the next question -- maybe that's right. I guess the next question would be is it -- would it -- if that is correct, would it even be appropriate for me to entertain the motion to remand?

Or would that be inappropriate and should I, instead, send it to the Missouri federal court to consider the motion to remand? Or would I have the authority to entertain the motion to remand now?

MR. KILARU: That's a fair question.

1          **MR. BRAKE:**  I think the Eastern --

2          **MR. KILARU:**  I think it could be sent back to the

3     Eastern District of Missouri for that reason, as you say,

4     because obviously the case should have been -- there's no

5     longer a basis for the case to be here for transfer purposes.

6     So it would go back to a Missouri federal court to be removed

7     in the first instance.

8          **THE COURT:**  Maybe that it's -- you know, sometimes the

9     rules require us to be inefficient.

10         **MR. KILARU:**  Yeah, yeah.  I think that, from our

11    perspective -- and I expect disagreement on this -- I think the

12    removal question is a pretty straightforward one as to whether

13    this should be in federal court.  So I think there's efficiency

14    in handling it and sending it back, but I understand that there

15    will be disagreement on whether removal was proper at all.

16         **THE COURT:**  Does either side have any objection to my

17    deciding the removal question, given the procedural posture

18    it's in and the possibility that it ought to be transferred

19    back to federal court in Missouri?

20         **MR. BRAKE:**  I don't think so, Your Honor.

21         **MR. KILARU:**  I don't think so either, Your Honor.

22         **THE COURT:**  Okay.  Well, then, let's at least talk

23    about that.  Even if neither side has an objection, there may

24    be a question whether I have the authority to do it.  And

25    that's something we'll have to ponder.

So you say that you think it's a pretty straightforward question that it was properly removed.  And the -- your argument, as I understand it, is that we should understand them to have proposed that the 108 plaintiffs be tried jointly, because they didn't say anything clearly to suggest otherwise and that's just been their general MO with respect to these cases?

**MR. KILARU:**  I would put it a little more strongly than that, which is that I think the case law suggests that when there's no affirmative indication that the complaint is not being consolidated for some purpose other than trial, you should interpret it to be a consolidated complaint through trial.

And I think that every indicia in the complaint is that they intended there to be one trial and one judgment.  I think the request for relief -- and you can see this in the brief, but there's a unified request for a judgment on each claim, there's a unified request for a trial.

And so I think the cases we've cited, *Ramirez* and *Visendi*, in both of those cases where there's no indicia in the complaint that they wanted something other than a consolidated trial and there are indicia that they did want a trial, it should be considered appropriate under CAFA.

**THE COURT:**  Put aside, for the moment, the parts of the complaint that you've cited that you say suggest that they

wanted a joint trial.  I'm not saying that those are

unimportant.  I'm just saying put them aside for a moment.

     It seems strange to me to have a presumption like that,

that they intended for the -- or desired for the plaintiffs to

have a trial jointly if the rules of the state permit, as a

matter of course, people to file complaints jointly with the

understanding that the cases will be managed together pretrial

but then tried separately.

     So, you know -- and as I understand it, that is the rule

in Missouri.  If I'm wrong about that, you can tell me.  But it

seems like the rules in Missouri contemplate, whether it's to,

you know, to save plaintiffs the filing fees or whatever, or

save plaintiffs the administrative hassle of filing separate

lawsuits and then filing motions to relate them or coordinate

them or consolidate them or something, that Missouri has this

practice of allowing individual plaintiffs to join together and

file the same lawsuit against the same defendant even if it's

kind of obvious that those cases could never be tried together,

and even if it -- just the purpose is to manage the cases

pretrial together.

          MR. KILARU:  On that I would say that at the time that

this case was filed in St. Louis City it actually was, if not

common, acceptable for plaintiffs to file cases that they

intended to go all the way through trial.

     So there was the *Johnson & Johnson* case, which was a City

trial with multiple plaintiffs, and that was filed and actually taken through trial with multiple plaintiffs.

So it's not that St. Louis just has a procedure that allows you to consolidate for pretrial purposes. At the time the complaint was filed, it was also permissible to take those cases to trial with a number of different plaintiffs at trial.

Now, since then the Missouri Supreme Court has indicated in an opinion in the *Johnson & Johnson* case that that's not an appropriate use of the St. Louis City venue; that you can't have what you have here, which is one St. Louis City plaintiff and 107 -- I think in that case it was 21 -- plaintiffs who have no connection to St. Louis City who are trying to join together for trial.

But I don't think it's as simple as saying --

**THE COURT:** What about if they had all been St. Louis City plaintiffs? Would it have been appropriate for them to go to trial together?

**MR. KILARU:** I think that's an unresolved question, but I think that the basis for saying that there couldn't have been a multi-plaintiff trial of the type that occurred was that there weren't other St. Louis City residents and that there were a bunch of other residents.

So I think that's the lens through which to understand the complaint. It's not as if the default rule in Missouri is you file and things are consolidated for pretrial purposes and then

don't go to trial together.  And I think that's where the way
the complaint was pleaded matters.

　　　　**THE COURT:**  What is the -- I mean, is it basically
that you file together and you proceed together, and then you
sort out later whether they're going to go to trial together or
not?

　　　　**MR. KILARU:**  I don't know the precise details on when
the decision is made as to have the cases go together for
trial.  I know that prior to the Johnson -- and this is still a
matter of litigation, I should be clear, in St. Louis.

　　　　There are some -- or at least there were some
multi-plaintiff trials involving Roundup that are on the
calendar for actual trial, not just for pretrial purposes.  So
that may all be revisited as a result of this *Johnson & Johnson*
ruling, but there were a bunch of those trials that were
proposed.

　　　　And I think plaintiffs can propose to the Court, and it's
up to the Court whether they want to agree with it or not, to
actually take cases through trial with a huge group of
plaintiffs, again, subject to the subsequent legal
developments.

　　　　So I guess I would say there's not a default that, when
you file a complaint like this, it's just going to be
consolidated for only pretrial purposes.  And I think that's
why, consistent with the cases -- the *Visendi* case from the

Ninth Circuit, but also just the complaint itself, you look at the complaint and see, you know, what's the best reading of what's happening here.

And given that there's one request for a jury trial and one request for a judgment, and obviously a huge number of plaintiffs, which has its own set of problems, but it is one complaint where I can see why the plaintiffs would see some advantage in trying to bring 108 plaintiffs into the courtroom in a single case.

**THE COURT:** So the upshot of your proposed solution to this is that, if the plaintiffs' lawyers had only included 99 plaintiffs in the complaint, this would not be removable as a mass action. But because they included 108 plaintiffs in the complaint, it is removable as a --

**MR. KILARU:** I wouldn't say that, because there's also case law about, say, three actions are filed on the same day that have 50 plaintiffs each, how do you construe that?

And I believe there's some case law that would look at those sort of three 50-plaintiff cases and say you should really view those as one action, and that's how you would get over the hundred number.

I do think in this case you have a 108-plaintiff claim that is over the CAFA limit, so you don't have to think about those questions.

But I guess what I would say, I don't think the number --

the number is obviously very important, and I think when you're over a hundred you are in CAFA territory. If you had three 99-plaintiff cases filed on the same day by the same law firm, you might still find yourself in CAFA territory.

MR. BRAKE: Well, there has to be a hundred plaintiffs, but they also have to have a proposal to be tried jointly, as Your Honor mentioned. And there's no explicit request in this complaint that all 108 plaintiffs have their cases tried jointly. That's the basis for our motion to remand the case.

THE COURT: Well, but why shouldn't we -- why shouldn't we interpret the complaint as a proposal that they be tried jointly?

MR. BRAKE: Because there's no affirmation or request -- affirmative request in the complaint to say that. So there should not be a presumption where there's no request.

THE COURT: Well, you asked for judgment for the plaintiffs --

MR. BRAKE: True.

THE COURT: -- on each cause of action.

MR. BRAKE: That's true.

THE COURT: There's no indication that you think there should be separate trials. Right?

MR. BRAKE: That's true.

THE COURT: Okay. It's also the case that you seem to

be asking for joint trials in all of the -- in -- wherever you can get them, as far as I can tell.  Right?

You have filed a case management statement in this court in which you have said we should take all the Central District of California cases and consolidate them together and send them back to the Central District of California for one trial.

So in light of that, how am I to interpret your complaint in this Missouri case as not contemplating that the 108 plaintiffs will go to trial jointly?

**MR. BRAKE:**  No, I understand your argument or your rationale, Your Honor.  I would say that absent some affirmation or affirmative relief, you should not make that presumption.

**THE COURT:**  What if -- okay.

I'm going to ask, sort of, a strange question.  How important is this issue?  I know it's important to the 108 plaintiffs and to you guys, but how often does this sort of thing really come up?

**MR. BRAKE:**  I don't think very often.

**THE COURT:**  It seems like a fairly esoteric question.

**MR. KILARU:**  I think it's fair to say that it's rare to see a 108-plaintiff complaint, and so I think that that's why the issue doesn't often come up.

**THE COURT:**  Part of the problem for me, I mean, I'm not familiar with the rules in Missouri and practices in

Missouri, but the idea of filing a 108-plaintiff complaint

seems so preposterous, I mean, you know, unless it's understood

that, you know, the only reason that the 108 plaintiffs are

filing the same lawsuit together is to avoid the, you know,

payment of 108 different filing fees and to avoid the

administrative hassle of filing motions to relate all the cases

to one another for pretrial purposes.

If the purpose of the rule is that, and the purpose of

joining the 108 plaintiffs is that, then it doesn't seem

preposterous.  But the idea of filing -- you know, joining 108

plaintiffs together for trial seems preposterous.

And so I assume you'd agree with that.

MR. KILARU:  Well, of course, but if --

THE COURT:  So if joining 108 plaintiffs together for

trial is preposterous, why should we assume that that's what

they were proposing when they filed the complaint?

MR. KILARU:  Because I think that there have been --

the proposal, at least, that I believe was on the table for the

judge there was for 15 to 20 plaintiffs at trial.  But that was

after a hearing in which both sides presented their position,

where I believe the plaintiffs' position was we should have all

multi-plaintiff trials, and our positions was we shouldn't have

any multi-plaintiff trials.

So, yes, I think it's -- I think that there is no basis

for trying 108 plaintiffs together, but I think, as you said,

when you take all the indicia we have here of requests for

multi-plaintiff trials across the board, I think it is sort of

an audacious request, but I don't think there's any indication

in the complaint that they intended it for anything other than

a 108-plaintiff trial.

And you, I think, can understand why, if the plaintiffs

could get that, they would want it, I mean, having 108

plaintiffs alleging the same injury --

**THE COURT:** Why anybody would want a 108-plaintiff

trial? I mean, I wouldn't wish that on my worst enemy.

(Laughter)

**MR. KILARU:** There's just one other piece of this,

too, which is the sort of forum selection aspects of this,

which is, there are a hundred plaintiffs in St. Louis because

at the time you could get a single St. Louis City resident and

bring as many other people as you wanted to into the case.

Now, I think that might not be the case. But I think

that's another reason why to get all these plaintiffs in for

trial.

**THE COURT:** But if that's true, I'm not sure that is

an issue to be considered in connection with this motion to

remand. I think that issue is relevant if the case is

remanded. Then, presumably, you could file a severance motion.

And then the question would be, if the cases were severed,

could -- you know, could some of them be removed at that point.

I don't know.  It would depend on whether there was diversity or not, and all that stuff.  Right?

     **MR. KILARU:**  Yeah.  I guess the question for now is -- we have an 108-plaintiff complaint.  And if you look at the *Visendi* case that we cited, the court looks at a complaint and they see that the complaint provides -- and I'm quoting from the opinion here -- plaintiffs and each of them demand a jury trial, and they allege being victims of a common plan and scheme, and they -- their initial complaint presented monetary relief claims of 100 or more persons proposed to be tried jointly.

That's not what was in the complaint, but that is how the Court understood what the plaintiffs were asking for.  So that's a case in which the Court clearly found that removal was proper.

So here I think you have all of that plus the knowledge that there has been a repeated effort to try to get multi-plaintiff claim complaints together.

     **THE COURT:**  Do you think that's appropriate to consider?  I mean, in other words, we're conducting an inquiry, basically, into the intent of the lawyers based on conduct that the lawyers have engaged in in other cases.

     **MR. KILARU:**  Well, I don't think the rule -- I think the rule that should -- all the rule needs to be is that you look at the complaint and see if, when you have a hundred

plaintiffs together, there's some indicia of something other than a request to try jointly, which is presumption when a group of people files a complaint and demands a jury trial, I would think they would want the case to go through to the end.

　　　　**THE COURT:** If there is that presumption, I guess I might agree with you. But that's the issue. Is there that presumption in Missouri?

　　　　For example, one of the things I would find interesting -- and I don't know if either of you has looked at this, but I would be interested in seeing -- looking at the Missouri practice guides. What do the Missouri practice guides say about filing complaints?

　　　　Are there provision -- do the practice guides say, hey, guess what, great news, in Missouri, you know, you can avoid paying separate filing fees and you can avoid the administrative hassle of moving to relate cases for pretrial purposes because you can just join all these plaintiffs together even if you know that they're never going to be tried together.

　　　　If -- you know, if the practice guides said that, then that would be evidence that, sort of, that's how things are done in Missouri. And it would be difficult, I think, to apply the presumption that you're proposing to apply.

　　　　**MR. KILARU:** I don't --

　　　　**MR. BRAKE:** I'm sorry. What actually happens, Your

Honor, is multi-plaintiff complaints are filed. Say 99. And

then what has a practical matter happens in reality is, let's

say, 10 will be picked, or a smaller subgroup, which indicates

an intent not to try all 99, which would kind of be impractical

even if you wanted to. But that's what happens in the real

world, if that goes to intent.

      **THE COURT:** I don't know if it goes to intent. Well,

I mean, maybe it does, but it -- I'm not sure I would quite say

that it goes to intent.

    I would say it goes to -- maybe it's a different way of

saying the same thing, but it goes to what is being proposed

when, you know, a lawsuit is filed that includes 108

plaintiffs.

      **MR. BRAKE:** Right.

      **MR. KILARU:** I guess I would say, Your Honor, that if

there's -- we have what we have, which is their complaint. And

if there's some other indicia they can point to that they

weren't trying to have these cases tried jointly, that would be

one thing.

    But, you know, under the statute you have a complaint in

which the claims of a hundred or more persons are proposed to

be tried jointly.

      **THE COURT:** Well, I think that begs the question.

Whether they're proposed to be tried jointly depends in part on

what it means to file a 108-person complaint in Missouri.

1      **MR. KILARU:** Right. But I think the complaint

2  itself -- I understand there's -- there's -- you could view it

3  as question begging, but there's also a question of what the

4  complaint actually asks for. And it asks for a jury trial.

5  And I think that looking past what the complaint asks for in

6  the context of removal --

7      **THE COURT:** Yeah, but that's just like boilerplate

8  stuff; right? I mean, that's just cut-and-paste.

9      I mean, if we're going to be real about this, I mean,

10  that -- do we really want to be hinging our decision on a

11  cut-and-paste job that somebody makes when they're slapping

12  together a complaint?

13      **MR. KILARU:** I don't know that this complaint would

14  count as a cut-and-paste job. I mean, there are allegations

15  about 108 different plaintiffs, and then there are allegations

16  about the common threads that unite their claims, or so it's

17  claimed.

18      But I think -- as a practical matter, I think there are a

19  lot of lawsuits -- at least there were a lot of lawsuits,

20  multi-plaintiff complaints filed in St. Louis City, because of

21  a perception that St. Louis City would be very perceptive to

22  the idea of trials with a large number of plaintiffs.

23      And what you have is, in that context, a 108-plaintiff

24  complaint that's filed, that has more than enough people under

25  CAFA, satisfies all the other requirements. And the indicia in

the complaint, to the extent there are any, is that there's a request for a single trial and a single judgment.

And I think, especially in the context of removal, which you have to measure at a point in time and figure out where the case should be based on what you have, I think looking at the complaint is the right thing to do. And the complaint here, I think, provides the answer.

THE COURT: What about the idea that when we're not sure about our jurisdiction, we should resolve that against jurisdiction?

MR. KILARU: I think that that's a presumption that goes as far as it goes. But I think when you have a complaint that, again, at least from our perspective, has 108 plaintiffs in it and lists the request for a jury trial and a judgment on each of those claims, I'm not really sure what the doubt is that there -- especially when it's filed in a jurisdiction where there's sort of -- at the time was a practice of having large multi-plaintiff trials.

THE COURT: But if you agree that the presumption applies here -- I think it does. But assuming you agree that the presumption applies here, why wouldn't I apply that presumption to remand the case in light of the doubt that's created by the practices in Missouri?

MR. KILARU: Because I think the way -- at least based on the cases we've cited, I think it's not -- this isn't a case

where you sort of use the canon of if there's any doubt.

THE COURT: But do you agree that that presumption against removal jurisdiction applies here?

MR. KILARU: I don't know that -- I don't think it applies here. I know that that is a general presumption about removal jurisdiction, but I think the cases we cited in the CAFA context say look at the complaint, and if it satisfies the requirements on its face and there's not some indication that they wanted something other than what the complaint on its face indicates, that that's a case that should be removed.

THE COURT: Anything else you want to say on this?

MR. BRAKE: No, sir.

THE COURT: Okay. All right. I'll think about that a little more. I may ask -- I assume, by the way, that we'll have -- well, I don't know. I don't know how long we'll go.

I was going to say we'll probably take a lunch break and then I may have questions after lunch. But I don't know how long this whole thing is going to last. We'll see.

Okay. So the next issue I think we should discuss then is the motion to remand the California case.

MR. KILARU: There are actually 11 of them, Your Honor.

THE COURT: Eleven California cases. Well --

MR. KILARU: Eleven -- they're similar. They're not all identical. They're very similar, but there are 11 motions

1    that raise a similar set of issues.

2        **THE COURT:** But they're all plaintiffs that were in

3    the same case filed in California, and then Judge Smith ordered

4    them severed, and we removed them.  Am I right about that?

5        **MR. KILARU:** Yeah.  The only thing I would say is each

6    of the 11 motions is, itself, a multi-plaintiff case.  So it's

7    not -- yes, so it's not -- there are 11 motions.  It's not 11

8    plaintiffs in one case.  It's 11 cases where they range from 8

9    to 27 plaintiffs, each of which has its own motion.

10    So, for example -- try just to pick one example.  One

11    second.  There's a motion to remand in Gonzales, which is just

12    one of the cases we have.  That case itself features ten

13    plaintiffs.  Then there's another motion in Taylor.  That case

14    features ten, and so on.

15    So it's not as if the ten motions are the ten plaintiffs

16    in one case.  It's ten motions regarding ten cases with large

17    numbers of plaintiffs in each.

18        **THE COURT:** Got it.  And I gather that, in each of

19    those cases, there are some plaintiffs who used Roundup for

20    residential purposes and others who used it for industrial

21    purposes or whatever -- however you would characterize that?

22        **MR. KILARU:** That's right.

23        **THE COURT:** Okay.  And I'm going to rely on you.  If

24    there are any important distinctions among the ten cases that

25    would make a difference, I'm going to rely on you to flag those

1     for me, because I haven't drilled down.

2             MR. KILARU:  Sure.  I think there are two distinctions

3     that sort of split the universe, but we can talk about this

4     when they become relevant.

5             THE COURT:  Okay.  So here is what -- so I start on

6     this -- and I think this question, by the way, is much more

7     important and is apt to come up much more frequently in cases

8     throughout the country.  You agree?

9             MR. KILARU:  Yes.

10            THE COURT:  Okay.  And I guess my starting point --

11    and this, I think, is reflected in my ruling on removal before

12    a defendant is served -- is that you have -- you know, these

13    statutory provisions are not very well worded, and you have to

14    interpret the language of the statutes in accordance with, sort

15    of, the purposes of removal jurisdiction.

16        And I guess what I think -- I don't know who's going to

17    like this least.  I think you'll probably like this least, so

18    I'll start with you.

19        I guess what I -- I think the best interpretation of this

20    statute that would be in accordance with the purposes of

21    removal jurisdiction is that when severance has been

22    effectuated, that effectively starts a new action.

23        You know, if you have a lawsuit where ten plaintiffs are

24    joined and they are severed into separate actions, those are

25    new actions and they can be removed.  And the clock starts on

removal again once severance has been effectuated.

Now, what does it mean to say that severance has been effectuated? I think that's where it can get a little bit tricky. In some places severance might be effectuated simply by the judge issuing an order saying these plaintiffs are hereby severed.

So maybe due to the, you know, state's idiosyncratic rules that it does not follow from a severance order that plaintiffs actually have to go through the mechanical process of filing separate complaints.

In other states -- and this is what Judge -- this is true of Judge Smith's cases, right, in California -- you know, a motion for severance may be granted or the judge may simply sever the cases -- order the cases severed, as occurred in this case.

But something else needs to happen before they become separate cases; right? Judge Smith said everybody has got to file a separate complaint by June 30th, or whatever it was. I can't remember.

But I guess my -- the way I propose to read the statute is that, for purposes of assessing whether a case can be removed, and for purposes of assessing when the clock starts again on removal, it is once the severance has been effectuated.

So if a severance is effectuated simply by a court saying these cases are not going to be tried together; these cases are

not going to proceed together, it's not necessary for everybody

to file a separate complaint, but I'm ordering that the cases

effectively be severed or not be tried together, that that is

the moment that severance is effectuated, and that's the moment

that defendant can remove the case, and that's the moment the

clock starts.

On the other hand, in a case like -- in the Judge Smith

situation, where she has said these cases need to be severed,

but we know that something else needs to happen before the

severance is effectuated, we wait until the severance is

effectuated.  We wait until the complaints get filed separately

before the defendant has the ability to remove them and before

the clock starts.

And so as that would apply -- so, for example, if it were

Missouri, and the Court simply said, okay, these cases are --

you know, these cases are not going to be tried together,

that's the end of the matter.  You don't all have to go through

the hassle of filing separate complaints.

Then in a situation like that, if there were diversity

jurisdiction with respect to one of the plaintiffs, the

defendant could remove that immediately.

But, here, because severance has not been effectuated,

Monsanto's removal of the cases, I think, effectively, are

premature.  But once -- and I think that's an important -- I

think it's important to conclude that the removal was

premature, because we don't know what the new complaints are
going to look like; right?

We don't know whether one individual plaintiff in these
cases might name a defendant who would defeat diversity.  We
don't know if one of the plaintiffs -- I mean, I think it
highly unlikely in this case but, theoretically, in other cases
there might be one plaintiff who doesn't meet the amount of
controversy, you know.

I mean, again, not -- I'm speaking of other cases.  We
know that the amount of controversy in these cases is a billion
dollars.  So I think there are a whole host of reasons to say
that, you know, if something else needs to happen before the
severance is effectuated, removal is premature.

But I do think -- and this is the rule that I would
propose to adopt for this case.  And you may disagree with
this, but the rule I would propose to adopt for this case is
that a defendant can remove once severance is effectuated.  And
the clock starts again once severance is effectuated because
it's effectively a new action that has been commenced within
the meaning of the statute.

So, practically, what that means here is that I would
grant your motion to remand, but, you know, once any of the
plaintiffs file individual complaints on June 30th, or whenever
the deadline is, Monsanto would have the right to remove any
cases for which there is diversity jurisdiction.

1          **MS. TABATABAIE:**  Good morning, Your Honor.  Tara

2    Tabatabaie for the plaintiff.

3          Again, I agree with the conclusion in some way.  Maybe not

4    completely.  Of course, in these particular cases, by the time

5    that the plaintiffs dismiss their cases, which they have not

6    done yet because --

7          **THE COURT:**  Do they have to dismiss their cases?

8          **MS. TABATABAIE:**  Yes.

9          **THE COURT:**  Or do they just have to file a separate --

10         **MS. TABATABAIE:**  No, no.  Judge Smith asked the

11    plaintiffs to -- for all plaintiffs, with the exception of the

12    first named plaintiff on each complaint, to dismiss their cases

13    and refile them as individual cases.  So that had not happened

14    when Monsanto removed the cases.

15         And that's actually against the law in the Ninth Circuit

16    that requires the cases be removable when filed and also

17    removable at the time of removal, which means if there -- you

18    know, if removal is based on diversity jurisdiction, there

19    should be -- there should not be complete diversity of

20    jurisdiction when filed and also -- or there should be -- I'm

21    sorry.  There should be complete diversity of jurisdiction as

22    the complaints are filed and also at the time of removal.

23         So at this point, as you mentioned, you know, since the

24    cases have not been effectively severed, when Monsanto removed

25    the cases there was no removability in the case.  And so,

again, the removal was -- you know, violates the law in the

Ninth Circuit.

In regard to the cases we're talking about, for most of

them, though, by the time that these cases are -- if they're

remanded, are -- are dismissed and refiled as individual cases,

then Monsanto would be past the one-year statutory limit on

removal.  And that's what, of course, Monsanto is complaining

about.

But as I'm sure Your Honor is well aware, the requirement

of removal, the right to removal is statutory.  And, you know,

the removal statute has to be construed very narrowly.

**THE COURT:**  Let me make sure I understand.

Is there any aspect of my proposed rule that you are

taking issue with right now?

**MS. TABATABAIE:**  You know, not with regard to these

cases.  But at the same time, for future purposes and for what

goes into your order, we believe that, you know, severance or

dismissal and refiling, based on Judge Smith's case management

order, would violate the voluntary/involuntary rule.

Because, as the Ninth Circuit has held in *Self versus

General Motors*, when an action is not removable as filed, it

cannot be, you know, turned into -- it can only be --

**THE COURT:**  Okay.  So I think I pretty strongly

disagree with you about that because this is a situation where

the -- you know, as a number of judges have put it, and I think

probably Judge O'Connell put it best in a case out of the
Central District -- I can't remember the name of it -- that in
this instance it's not the plaintiff themselves that has
control over removal jurisdiction. Right? It's only the
choice of some separate plaintiff to join them in the
litigation.

And so it strikes me that the voluntary/involuntary rule
that you're invoking probably does not apply here. And I think
that it also just seems -- again, stepping back and considering
the purposes of removal jurisdiction, it seems inappropriate.
Right?

I mean, if you were right, then what that means is that,
you know, anytime plaintiffs' lawyers wanted to avoid removal
jurisdiction, they would simply improperly join. They could
simply improperly join plaintiffs on a single complaint and
then run the clock out.

And that happens all the time, right, where multiple
plaintiffs are joined in a single complaint, and they get tied
up in some coordinated proceeding, and more than a year goes by
before everything gets sorted out and the plaintiffs get
separated out as they should have been from the beginning.

But the plaintiffs' lawyers have avoided removal
jurisdiction. And that seems contrary to the purposes of the
removal statute. And I think it's an argument for construing
this language about when an action commences as sort of -- as

we are reflecting the notion that when severance is actually effectuated new actions commence.

**MS. TABATABAIE:** I agree, Your Honor.

**THE COURT:** Okay. And then so I think what that would mean is that when the -- okay. That's fine.

Do you want to discuss any of this?

**MR. KILARU:** Two very quick points.

I think what Your Honor said -- if I understand correctly what Your Honor said, it would be that when the new complaints are filed in front of Judge Smith, we would be triggering sort of a new period under 1446(a)(2) -- or (a)(3), I guess, the one-year period, because there's sort of a new action and sort of a new event triggering removal.

**THE COURT:** I mean, it's not obvious, if you're just looking at the language of the statute in the abstract, that that is the right answer. But I think when you consider it in the context of the purposes of removal jurisdiction, I think it would be too contrary to those purposes to interpret it otherwise.

**MR. KILARU:** That makes sense. I just understood -- or at least I believed I heard counsel to be saying that they would argue that our removals would become untimely if we filed them later. I just want to make sure that -- I understand Your Honor did not agree with that.

**THE COURT:** What I'm envisioning is that that would

1  not be the case.

2  **MR. KILARU:**  All right.

3  **THE COURT:**  So that, effectively -- I guess my view is

4  that, to the extent you're arguing fraudulent joinder, that's

5  not -- that's not a timely basis for removal.

6  To the extent you're saying that there was fraudulent

7  joinder, you could have figured that out when the lawsuits were

8  filed or shortly after the lawsuits were filed.

9  So to the extent you're asserting fraudulent joinder as a

10  basis for removal, I don't think that's timely.  However, you

11  know, the act -- I also believe that the act of severing the

12  cases creates new actions that start the clock again on

13  removal.

14  And so once the case -- once the severance is fully

15  effectuated in the state court, you do have the right to remove

16  any case that is -- for which there is diversity jurisdiction.

17  But I don't think -- but I think to the extent you're asserting

18  severance as a basis for removal, that's premature because I

19  don't think a severance has been effectuated.

20  **MR. KILARU:**  Understood.  I think we may have

21  arguments based on how the new complaints are filed, that there

22  could conceivably be some fraud --

23  **THE COURT:**  Fraudulent joinder.

24  **MR. KILARU:**  Those cases which we would make at the

25  appropriate time.  As a legal matter, I think that's fine.  I

1  think that, as I understand it, protects our rights to remove.

2  I would just say as a practical matter we understand the

3  cases to have been severed.  So in that sense the issue -- we

4  do have an order from which we could ascertain that the cases

5  would be removable.  But I think --

6  **THE COURT:**  And I understand that.

7  **MR. KILARU:**  Yeah.

8  **THE COURT:**  What about the point that I made earlier,

9  that, you know, in a situation where there is no requirement in

10  state court that somebody actually go through the process of

11  filing a new individual complaint, and that the judge's

12  severance order is essentially the end of the matter with

13  regard to severance, and so we know who the individual

14  plaintiff is, we know who the defendant is, we presumably have

15  a sense of the amount in controversy, that's sort of the end of

16  the matter, and so the question whether there is going to be

17  removal jurisdiction on that severed case can be answered right

18  then.

19  But the question can't be answered in a situation where

20  you're making a plaintiff go file a separate complaint, because

21  we don't know yet what's going to be in that separate

22  complaint.

23  **MR. KILARU:**  Understood, Your Honor.  I think the plan

24  makes sense in terms of we'll see what complaints get filed,

25  and then, as I understand it, we would have the right to remove

any cases where we either think there's diversity on the face or we have an argument about some sort of misjoinder.

    **THE COURT:**  And I guess the one thing that concerns me -- I don't know if you have any thoughts on this or not. You don't need to, I guess.

    You know, the thing that worries me is this feels like a good solution for this situation, and it feels like the right solution for this situation.  It feels like a solution that is consistent with the statute and the purposes of the statute.

    But I'm wondering if, you know, like I said, this -- in contrast to the last remand motion that we just discussed, this one seems important, and it seems to have implications for many other cases.

    I'm just wondering if you could step back and think about the rule that I'm proposing, and tell me if you think it makes sense.

    **MR. KILARU:**  I think it makes sense.  I think that, practically, as I said, there are reasons that the issue could be addressed now.  But I understand where you're coming from on that.

    I guess the only thing I'd say is, to the extent this is an approach going forward, I would think -- and I understand this to be what you're saying as well -- that this would only be the case in a situation where you do have what I view as a slightly unique circumstance here where the judge has ordered

severance and then told everyone to file new complaints at some

period of time in the future, as opposed to a situation where

there's a severance order and maybe it's a little less clear as

to whether new complaints need to be filed or not.

THE COURT: Yeah. And, you know, it may be in a

situation like that perhaps it would be incumbent upon the

defendant to seek clarification in state court about, you know,

whether anything else needs to happen to effectuate the

severance.

MR. KILARU: I think we would intend do that. I guess

the only thing I'd say is, to the extent we didn't get that

clarification, you might find a motion to remand within the

time period sort of protective of that purpose.

THE COURT: I think in this case, in this situation,

it's clear. But you're talking about in other situations where

it's less clear.

MR. KILARU: Right. Yes. Here I understand there to

be a game plan, which is there will be a new complaint filed at

some point in the future, and then we can sort of address the

arguments as we need to when that happens.

THE COURT: I think that's -- well, I don't know. I'm

not an expert on how things work in the state courts. But I

always thought that was typically how it worked, that, you

know, the Court grants a motion for severance and requires all

of the plaintiffs to file individual complaints.

1     Do you know anything about that?

2     **MR. KILARU:** I couldn't comment on state practice

3 generally enough on that.

4     **MS. TABATABAIE:** May I make a clarification, Your

5 Honor?

6     **THE COURT:** Yeah. Mr. Wisner wants to say something

7 to you or to me or somebody.

8     **MR. WISNER:** Your Honor, Brent Wisner. I've been --

9 I'm lead counsel for JCCP, and I actually argued with Judge

10 Smith on the severance issue.

11     I don't think, based on interactions with Judge Smith,

12 that the idea for severance was that they would be tried

13 separately or that the idea was that they're individual cases

14 that need to be separated.

15     I think it was largely an administrative point, that she

16 was having a difficult time tracking what cases were up. I

17 don't think she ever intended her severance order resulting in

18 wholesale removal of cases from the JCCP.

19     And if, in fact, that's where the Court is headed in

20 ruling on the timing issue, I think there's going to be a lot

21 of individual factual issues.

22     For example, a lot of these plaintiffs have been going

23 through discovery. You know, plaintiff actions have been

24 served. It's not like they've just been sitting there and no

25 litigation has occurred.

So the spirit of the removal statute, that if it's been proceeding for longer than a year in state court, I think, is going to be individualized. And I don't think we can make a hard rule here in a vacuum that the clock restarts, because I think sometimes it won't.

I think there will be instances, for example, where a plaintiff, you know, filed and was there for longer than a year. Monsanto could have argued fraudulent joinder from the beginning. They could have moved to sever, and they didn't for a year. At some point that plaintiff is entitled to the forum that they chose, which is the state court.

So I would be remiss in this court issuing a prospective order on the rule, because I think it's really going to be case specific. And it will largely affect how these cases are repled in state court.

You know, will more defendants be brought in? Will -- you know, I might even have to go to Judge Smith and say, I think this severance order creates serious administrative problems, maybe we don't do it.

I mean, this is reality. This is how this works. And so I don't think her intention was to restart the clock on these cases. I think her intention was just to get it administratively --

        **THE COURT:** Well, I'm sure her intention was not to restart the removal clock on these cases. I don't think

anybody assumed that it was.

But what she did is she said, look, all of these cases -- all of these plaintiffs are grouped together in this complaint; I can't -- I can't make heads or tails of this, I'm ordering separate lawsuits to be filed.  Right?

I mean, it's a good point.  I hadn't really thought of the fact that she wasn't -- you know, her basis for doing that was not so much that they were improperly joined as it was, you know, sort of to avoid an administrative headache.

But how different are those two things, really, because, you know, is there any doubt that they were improperly joined?

**MR. WISNER:**  Absolutely.

**THE COURT:**  I'm not saying fraudulently joined.  I'm not saying that.  But, you know, I just don't -- again, I don't have a great understanding of this, but I thought that the joinder rules in California were similar if not identical to the ones in federal court.

And if so, I mean, if you filed -- and we'll talk about this later.  If you filed a complaint in this court with ten different people who were exposed to Roundup and got NHL, I would sever those in a heartbeat.  I would say those are improperly joined, clearly improperly joined.

**MR. WISNER:**  Well, I think you'd have to look at the complaint first; right?  I mean, there could be a situation where ten plaintiffs -- like, for example, here's some factual

stuff.

For example, the label -- the warning label for Roundup, as we have it today in the lawn and garden context, that label was actually crafted through studies done at UC Davis.  Okay?  And so there is a common factual thread -- I mean, I can get into a lot of factual stuff.

I know the discovery -- this gets pretty [indiscernible], but there's a way you can allege a common factual basis that would be slightly different than Joe's --

**THE COURT:**  I don't understand how it would ever be appropriate, under the federal rules, to try ten or five plaintiffs together in a case like this, because the inquiry about whether it was Roundup that caused their NHL or something else that caused their NHL is going to be so individualized.  Totally inappropriate.

**MR. WISNER:**  What if ten farm workers working for the same farm for the same period of time, spraying the same product, using it in the same context, with the same protective gear, with the same employer and the same sales representative from Monsanto telling them it's safe enough to drink?  I think now we're getting much closer to a world where a common trial would actually make a lot more sense.

And all I'm saying, Your Honor, is I think we should be careful in making blanket future statements because I think it does depend.  Insofar as issuing the remand order in this case,

I think you should be careful about saying the clock restarts,
because I don't know if that's the case.

    THE COURT:  Didn't Judge Smith -- I mean, maybe I
should pull up her order, but I thought that Judge Smith's
order contemplated the kind of scenario that you just
described.

    In other words, correct me if I'm misremembering, but I
think she said that everybody has to file an individual
complaint unless there is some sort of extraordinary
circumstances that warrant putting them together as the husband
and wife were in the Alameda County case.

    MR. WISNER:  Sure.

    THE COURT:  Didn't she say that?

    MR. WISNER:  Sure.

    (Unreportable simultaneous colloquy.)

    THE COURT:  So your example that you just gave me, I
mean, I assume it would be consistent with Judge Smith's
severance orders to file those -- file a case for those ten
plaintiffs together.

    MR. WISNER:  Sure.

    THE COURT:  And that you wouldn't be violating her
order.

    MR. WISNER:  Sure.

    THE COURT:  I mean, I assume that her severance order
was driven by, you know, in large part, a desire for

administrative convenience.  But why isn't that effectively --
why can't we treat it as, you know, a conclusion that these
people are improperly joined, given the fact that she said
everybody has to be severed unless there's -- unless there are
particular facts that justify putting them together?

     MR. WISNER:  I think we really are now in "it depends"
land.

     THE COURT:  Okay.

     MR. WISNER:  And that's all I'm saying, Your Honor.

     THE COURT:  And all you're saying is, if I rule the
way I'm proposing, I should account for that possibility.

     MR. WISNER:  Yeah, and say it's going to depend on the
complaint that gets filed.

     THE COURT:  It doesn't automatically mean that every
plaintiff has to file individually.  That is, you know, the
plaintiffs can file in accordance with her order.  But then the
question is, you know, does each individual -- is each
individual lawsuit subject to removal jurisdiction; right?

     MR. WISNER:  Sure.  And I think in an individual
lawsuit, for example, like there might be a plaintiff who has
gone through significant discovery, medical productions,
subject to motions to compel and protective orders in front of
Judge Smith, or previously Judge Petrou, and, you know, now
they have to sever and refile because Judge Smith decided she
wanted to change the sequence, in that context the clock

resetting seems a bit odd.  Right?

Whereas, someone who just filed it and it got removed, and they haven't done anything for over a year in state court -- I mean, the spirit of the removal statute isn't just a hard line. And that's all I'm saying, Your Honor.  I think it needs to be carefully construed --

**THE COURT:**  I understand what you're saying, but on the flip side, you know, the plaintiffs' lawyers file a complaint joining 15 different plaintiffs.  And at least, if the rules are anything similar to the federal rules, you know, the joinder is improper.  Not fraudulent but improper.

And the case gets tied up in this mass -- you know, massive proceeding, and they don't get around to getting severed until more than a year later, and that results in the defendants not being able to remove the individually filed cases later on, that doesn't make sense either.

**MR. WISNER:**  Sure.  But, conversely, if they knew about this improper joinder from day one and could have taken action a year ago to get that resolved, and didn't, similarly, it doesn't seem fair that they can say, aha, now it's severed two years later, after we've engaged in discovery.

**THE COURT:**  But I've seen a number of cases where defendants have requested severance early on.  I don't know if it happened in this case, but the defendants requested severance early on, and the judge said, I'll get to that later,

1    I've got a bunch of other stuff I've got to deal with, with

2    respect to these cases right now, we'll clean that up at the

3    back end.  Right?

4         MR. WISNER:  Sure.  But, again, I think we're --

5    you're right.  I think that's -- that's an interesting --

6    there's all these wonderful hypotheticals.  Again, I think it

7    depends.  That's all I'm saying, Your Honor.

8         If you issue an order saying the clock automatically

9    restarts, I think that that will run roughshod over the

10   individual characters by these individual lawsuits that could

11   be different.

12        So when they remove that case, let's say, or if they

13   attempt to remove it, there may be circumstances about that

14   case where they had the opportunity to seek severance, never

15   did, there's been substantial discovery, and maybe there the

16   clock doesn't restart.

17        THE COURT:  And this is something I meant to look at,

18   but I forgot to look at it.

19        Are there cases where a defendant removes within the

20   one-year period but the courts have held that the defendant

21   unduly delayed in removing?

22        MR. KILARU:  I don't believe that's the law.

23        THE COURT:  Sort of like a hard line?

24        MR. KILARU:  Yeah, I don't believe that's the law,

25   which goes to why I would oppose the suggestion that, you know,

just because we didn't move earlier within -- as long as we moved within the one-year period, I think we have a right to remove if the appropriate circumstances are checked.

I think in these circumstances there are a lot of plaintiffs who are only in state court and thus not subject to removal because they were part of a case that had claims against the defendant who they individually had no claim against.

**THE COURT:** Right. But what about the problem -- hypothetically, let's say you have a situation where, you know, ten plaintiffs are joined in a lawsuit. You know, the case is tied up in a massive coordinated proceeding. You know, they get to the eve of trial, and then all of a sudden the judge says, oh, by the way, you know, these cases are not going together; they're going to go one by one, and so I'm effectively severing. And then the defendant immediately removes the cases to federal court on the eve of trial.

I mean, is there a way to -- that's the concern that Mr. Wisner is effectively expressing.

Do I have that right?

**MR. WISNER:** Yes, Your Honor.

**THE COURT:** So is there a way to prevent that?

I mean, if the Court doesn't have the ability to say, not withstanding the fact that you removed within the one year, you unjustifiably delayed in removing, what would prevent that sort

of harm from occurring?

MR. KILARU: Well, I think we get a year from the order from which it may be first ascertained that the case is one which has been removed.

I mean, that's what we have. We have a year from the point in time at which there's an order or other paper or pleading or whatever the case may be.

So I don't know that the scenario you're envisioning, which is I guess -- I guess the scenario would be one of these cases gets to the eve of trial, and then on the eve of trial then the judge says --

THE COURT: That's the scenario.

MR. KILARU: Right. I don't know that that relates to any of what we're dealing with right now.

THE COURT: No, but because this is an important issue and because --

MR. KILARU: No. Understood. If a plaintiff is going to trial in state court and there's complete diversity, and the only reason there hasn't been diversity is because, you know, up until that point the cases have been together, whether proper or not, I would think once it becomes appropriate to sever -- once the cases get severed, I think you would have a right to try to remove the case.

Now, in that circumstance a judge could determine that there's so much water under the bridge and there could have

been an effort to sever and file earlier and, therefore, there's no basis for doing so.

**THE COURT:** Could a judge do that, I mean, even if it's within the one-year period? That's the question I guess I'm saying I haven't looked into.

**MR. KILARU:** I would think that if you get that -- I don't know the answer to that off the top of my head. I think as you get closer to trial a judge's ability to, for example, construe doubt in favor of nonremoval might be a circumstance where that rule would play.

I think here the complaints were filed. You know, there is an order, where a year after the complaint was filed the order is issued, we file within 30 days of that order. I don't think that that's implicated for any of these cases.

**THE COURT:** It's not for these cases.

**MR. KILARU:** Right. I understand.

**THE COURT:** I'm thinking about these asbestos cases where, you know, these -- I'm going to try not to use any adjectives. The defense lawyers in the asbestos cases often wait until the eve of trial and then they file improper removals.

**MR. KILARU:** I guess I would say this: I think you can expect that, given our general views on multi-plaintiff trials, that if there are multi-plaintiff trials that we believe can be severed, we'll be filing those motions when we

think we have the legal ability to do so, including on the grounds that there's' an improper joinder earlier on if we believe --

    **THE COURT:**  Yeah, I understand.  I'm just trying to figure out what the appropriate rule is sort of generally.

    **MR. WISNER:**  I would point out, Your Honor, just factually, that actually California rules on joinder are actually much more liberal than federal rules.

    **THE COURT:**  Is that right?

    **MR. WISNER:**  Yeah.  And they're interpreted much more liberally.

Also, I would point out that Judge Smith specifically contemplated that the --

    **THE COURT:**  Do you have a cite for that?

    **MR. WISNER:**  Sure.  It's California Civil Procedure 378 through 384.  It's the section on joinder under the California code.  And we actually briefed and litigated this issue quite extensively in the Pilliod case, because they were joined plaintiffs.

But I'd also point out, Your Honor, that Judge Smith specifically did not contemplate the statute of limitations, right, restarting or, you know -- because some of these cases --

    **THE COURT:**  That's none of her business; right?  I mean, you're talking about the removal limitation period?

         **MR. WISNER:**  No, no, no.  Statute of limitations like
for filing a timely claim under California law.  A lot of these
plaintiffs that were being severed and refiled would be
untimely claims because it's beyond two years from when they
should have filed the lawsuits.

         And for those that --

         **THE COURT:**  Right.  But I assume that the -- I assume
that the -- it seems obvious that the statute of limitations is
tolled in that circumstance.  But it also doesn't seem like
that answers the question whether, within the meaning of the
removal statute, a new action has been commenced.

         **MR. WISNER:**  Well, why I point to that is it speaks to
Judge Smith's intention in the severance.  I don't think the
intention was to create new jurisdictional issues or to
substantively effect the claims that had been filed.  It was
purely an administrative point.

         And, frankly, as soon as the Court issues an order, I'm
going to read it carefully.  I might have to go to Judge Smith
next week and say, all right, I think we need to reconsider
what we're doing here because this is -- the implication is
happening for removal, and I don't know if that was the intent.

         And I would also point out that she has signaled that
there very well may be joint plaintiffs' trials.  The proposed
CMC there is to have ten, ten, twenty worked up for trial.  And
they may be consolidated for trials in bubbles of ten or sent

1    back to state court.  She hasn't decided yet.  But she hasn't

2    suggested there will not be multi-plaintiff trials.

3         I mean, that's -- that's -- I don't think she --

4         **THE COURT:**  That's the proposal in your CMC.  That's

5    not --

6         **MR. WISNER:**  No, no.  It's hers.  This is an order

7    that's been issued.  It models the same procedure she's using

8    in the *Essure* JCCP that she's overseeing as well.  She said

9    we're using that model.

10        And I believe we're actually in the process of negotiating

11   it, but that's -- I think we've agreed on that premise already.

12   Now, whether or not they will be joined trials or not is

13   something that we're sort of punting on the joint submission.

14   But there's going to be 40 cases worked up at one time, and

15   pretty aggressively.

16        And then she's either going to remand them, consolidate

17   them for trial in Alameda, or maybe consolidate them in Alameda

18   and then remand to state court.

19        **THE COURT:**  I would be very surprised if that's what

20   she was thinking.  I mean, why would she have said -- why would

21   she have said there needs to be a separate complaint unless

22   it's a situation like the -- who are the two people who went to

23   trial?

24        **MR. WISNER:**  The Pilliods.

25        **THE COURT:**  A situation like the Pilliods', it has to

be a separate complaint.

          MR. WISNER:  I think she's trying to get a handle --
and I think this is what she told us.  She's trying to get a
handle on how many actual plaintiffs there are in the case,
because that affects how many need to get worked up at a time.

     Because I think Judge Smith's intention is not -- it's to
get these cases done, to get through the JCCP and have us punch
through all 4- or 500 of them and get them out.  And that's our
viewpoint on it.

     And so whether they're tried in Alameda or whether they're
tried in their home courts, whether there's joined trials, I
suspect, frankly, that she has no intention of having 500
individual trials.

     I'm pretty sure there's going to be starting to be
joinders as we progressively go down the road and saying, okay,
let's do ten at a time, let's do -- and hopefully --

          (Unreportable simultaneous colloquy.)

          THE COURT:  I can imagine the temptation to do that,
but -- sorry, what were you saying?

          MR. KILARU:  I think that -- from my colleagues who
are litigating that case and have been at these case management
conferences, I think there is nothing close to an affirmative
indication from Judge Smith that she is going to be
contemplating 10 or 20 or whatever number of plaintiff trials.

     In fact, the issue of whether the Pilliods would be

jointly tried was something that was briefed extensively. And there was actually a tentative ruling saying they shouldn't be tried jointly, and then -- so she changed her mind on that.

So I think it's way too early to make any kind of prediction that there would be a multi-plaintiff trial of 10 or 20 or however many plaintiffs in the future.

But, I guess, going back to a point made earlier, if there is going to be an effort to revisit the severance order after it's been made, then I think that sort of needs to be backed into whatever Your Honor decides as well.

Because if they're going to take the position with Judge Smith that actually the cases aren't severed and so, you know, nothing has restarted, then I don't think we should be out of luck in terms of trying to remove the cases because an order changes afterwards, which is why we sort of understood the order to do the severance, because it says file these complaints separately.

**MR. WISNER:** Just factually, the tentative that he referred to is not by Judge Smith. It was actually by Judge Petrou.

**MR. KILARU:** Oh, I'm sorry. Yes, it was by another judge before. That's correct.

**THE COURT:** Okay. So here's what I propose we do. We've been going for like an hour and 45 minutes. Obviously, we have -- I assume it's going to require a fair amount of

discussion, this plan for how to manage the cases.  And we've
got a couple other little things to talk about.  Severance.  I
may have a couple more questions on this remand issue.

So why don't we take a lunch break and come back at -- why
don't we say 1:00 o'clock, because I have something that I need
to take care of during the lunch break as well.  So why don't
we resume at 1:00 o'clock.  And I assume we'll go for like
another hour or something like that.

**MR. WISNER:**  Thank you, Your Honor.

**THE COURT:**  Okay.  Thank you.

(Recess taken at 11:43 a.m.)

(Proceedings resumed at 1:06 p.m.)

**THE COURT:**  Okay.  I do want to talk a little bit more
about this remand motion, the California one.

I was thinking a little bit more about Mr. Wisner's
comments over the lunch break and wondering if it would
actually be more consistent, for the purposes of the rule
statute, to construe it so as to not restart the one-year clock
but to restart the 30-day clock.

And the 30-day clock would be restarted by, as I said
before, the completion of the severance or the effectuation of
the severance, because until the severance is fully
effectuated, we don't know if the case is going to be
removable.

So it seems to me that the document that you got from

Judge Smith, her order, which I went back and read during the lunch break, does not -- is not a document that actually establishes removability, because we don't yet know what the cases -- what the new complaints that she ordered filed are going to look like.

So I think the document that you receive in the litigation that starts the 30-day clock running is the new complaint. But with respect to the one-year rule, it seems like it's probably a more natural reading of the statute to say that the action has not recommenced -- that the action commenced when it was filed.

And in terms of that one-year clock, you know, if the defendant wants to make sure that the severance happens beforehand, they've got to get on top of it. And sometimes it will work and sometimes it won't work, but it sort of makes it incumbent upon the defendant to try to make that happen in the state court before the year clock runs.

**MR. KILARU:** A couple of reactions. One, for example, the Gonzalez complaint was filed on March 19, 2018.

**THE COURT:** Okay.

**MR. KILARU:** So if the year doesn't change, it's May 2019 when they refile.

**THE COURT:** Well, when do they refile?

**MR. KILARU:** When they refile, if the year starts again, then I think that -- I guess they would --

1    **THE COURT:** I'm saying it doesn't start again. I'm

2 saying I'm kind of -- I think I may be persuaded by

3 Mr. Wisner's point about the one-year period.

4    So, in other words, you're saying the Gonzales complaint

5 is a multi-plaintiff complaint?

6    **MR. KILARU:** Yes.

7    **THE COURT:** And it was filed on March 19, 2018?

8    **MR. KILARU:** Yes.

9    **THE COURT:** And so what I would say about that is that

10 you -- I think my rule -- this different rule that I'm

11 proposing now would say that your removal -- you can't remove

12 it now because we don't know whether there is jurisdiction over

13 any of those -- we don't know whether there's federal

14 jurisdiction over any of those cases, because they haven't

15 filed their new complaints.

16    And because Judge Smith set a deadline of June 30th, 2019,

17 to file the new complaints, that will be outside the year, and

18 so they will not be removable.

19    And it was incumbent upon -- so any of the complaints that

20 were filed after June 30th, 2018, would still be removable.

21 But the ones that were filed prior to then would not be

22 removable.

23    And had Monsanto wanted to establish federal jurisdiction

24 over those cases, it should have done something to get them

25 severed earlier.

And it might not have been able to do so.  It might have been sort of these cases might have been held hostage to the vagaries of the state court system, but that's life.

**MR. KILARU:**  Well, respectfully, we disagree with that.  I mean, I think, first of all, it comes back to how you construe her order and what you construe that order to have done.

And, yes, it's true that new complaints will be filed on June 30th, but I think the overwhelming presumption in that order is that they will be individual complaints and that it won't be proper to file the same template of complaints that were the reason why we couldn't remove the case earlier.

I mean, I think, because the cases got put in -- as you said earlier, because the cases got put in this process where there were eight plaintiffs in Gonzales, for example, who had no basis for being in state court --

**THE COURT:**  I understand, but -- you know, so two things.  One, just looking at it strictly from the standpoint of the statutory language, when did this action commence?  I think it's ambiguous.  I think it could probably be interpreted either way.

But I think probably the more natural interpretation is that the action commenced on March 19th of 2018, and that it's not a new action commencing on June 30th of 2019.

And then I think, again, when you're thinking about the

purposes of the removal statute, which in some ways might be even more important than the language, given how ambiguous the language is, you know, I wonder if it's more consistent with the purposes of the removal statute and with our understanding of removal to say, you know, it's incumbent on the defendant to get the case severed within a year so that they can take it to federal court if they wish.

**MR. KILARU:** I guess the reaction to that would be I think if we're viewing these new complaints as new complaints that potentially will name new defendants -- and I don't know if they'll contain other theories or whatever the case may be, but there's something new that's going to be filed on the 30th. So that's one thing as to when the action is commencing.

And it's clear that Judge Smith would not be allowing the complaints, in their existing form, those actions to commence. So I think that's one reason to think of what's going to happen on June 30th --

**THE COURT:** Well, is that the right way to think of it? Or is the right way to think of it that the action commenced in March of 2018, and she's not allowing them to go forward in their current form?

**MR. KILARU:** Well, I think they're ended in their current form. They don't exist in their current form. There's new pleadings. For example, Gonzales, I think, would have to, presumably, involve ten different complaints filed by ten

different plaintiffs.

And maybe there'll be other parties named. I don't know how the complaints will be different, but that action doesn't exist anymore other than in the sort of fictional sense that, until the 30th, it's sort of still on the docket.

THE COURT: Well, it doesn't exist any less than when you, you know, dismiss -- you know, there's a 12(b)(6) motion and you dismiss a complaint with leave to amend, and then a new complaint is filed 21 days later.

During that 21-day no man's land, you know, in the sense that you're describing, there's no -- there's no complaint that exists, but we still would all understand the action to have begun at the time when the original complaint was filed, even though it was dismissed with leave to amend.

MR. KILARU: Right. But, presumably, in that case you wouldn't have a fundamentally different action that's coming out the other side taking -- going from ten plaintiffs added together, making claims against a variety of defendants, some of whom they wouldn't be able to make claims at --

THE COURT: Is it really fair to characterize it as a fundamentally different action? I mean, it's largely the same action brought by the ten plaintiffs, just in separate lawsuits.

MR. KILARU: And I would think against not some of the defendants who were parties to the previous case --

1          THE COURT:  Right.

2          MR. KILARU:  -- which is sort of the nature of our

3     objection.

4          THE COURT:  Right.  But people -- I mean, again, in

5     regular litigation, you know, you file a lawsuit, you name

6     three defendants, you drop a defendant along the way.  That

7     doesn't somehow make it a different action.

8          MR. KILARU:  That may be the case if you, the

9     plaintiff, decide to drop that action.

10         But in this case, these complaints were filed.  I think

11    Judge Smith said these are not going forward as they are; file

12    new complaints by June 30th.

13         And so as they are today, the only --

14         THE COURT:  Just like you say, under Rule 12(b)(6),

15    this is not going forward as it is.  File a new complaint in 21

16    days.

17         MR. KILARU:  I guess we think -- our position is that

18    it's fictional to think of these cases as continuing on in

19    their current form only up until the point at which a new

20    complaint is filed, in which case it's still the same action

21    but we don't have a right to remove it.

22         I mean, I think the judge issued an opinion that says

23    these cases --

24         THE COURT:  Well, I'm saying you do have a right to --

25    what I'm proposing -- again, I'm thinking more in terms of what

the right rule should be generally, and then let's figure out

how it applies to your ten cases that we're talking about.

But I think the answer is you do have the right to remove

it once the new complaint is filed, unless it's past the year

mark.  Right?  That's the point.

So even though it's not a new action that's been

commenced, even though it's a continuation of the same action,

the document that is filed that allows you -- that gives you

the right to remove is the new complaint, which establishes

that there is removal jurisdiction.  Right?

And until then you don't know if there's removal

jurisdiction.

**MR. KILARU:**  I guess I'd say right now we have a

series of complaints against -- by certain plaintiffs against

certain defendants.

We know that those complaints have been split up.  And we

know against which defendants the individual plaintiffs could

plausibly allege a claim, which I think is enough of a basis

for these cases to be removed.

Because we know that for eight of the defendants in one of

the actions, for example, Gonzales, and for four in another and

six in another, there's no basis for that case -- we believe

there wouldn't be a basis to defeat removing the case to

federal court.

And I think the one-year bar shouldn't be construed to

sort of, on the one hand, allow the sort of action to -- I guess I would say I don't think we can view the June 30th filing as simultaneously not something that retriggers the one-year bar but something that allows removal to be defeated because it is a new case and a new complaint.

**THE COURT:** Why not? I mean, that happens all the time in removal; right?

I mean, in the normal case where the case is not immediately removable, you say, okay, when was the document filed that shows us that there's federal jurisdiction that triggers the 30-day clock for us to remove?

And then we have to separately ask, well, did this happen within the one-year period? And if it didn't happen within the one-year period, tough luck for the defendant; right? So why shouldn't the same concept apply here?

By the way, even in the normal case, there's any number of reasons why it might be tough luck for the defendant; right? The trial judge in state court might take too long to rule on something that, you know, causes there to be jurisdiction. Or it may take too long to get discovery responses from the plaintiffs' side that establishes the amount in controversy. Or whatever the case may be.

But isn't the answer typically tough luck for the defendant then?

**MR. KILARU:** I think the incentive it creates the

other way is basically do what happened here.  File a complaint

grouping a bunch of people together, including one plaintiff or

two or more who have a claim against a California defendant,

and then, you know, whether or not we get PFSs or whether or

not the complaints give us -- in some of these cases the

complaints did give us enough of a basis to believe that there

was a fraudulent joinder, but in other cases it wasn't until

the PFSs were filed.

And it sort of creates an incentive to say, let's put

these case into a state court proceeding and hope that a year

runs before there's some kind of order that launches the filing

of a new complaint.

I think this event that's coming up, the filing of new

complaints, is not something that would typically happen.

THE COURT:  Well, could you -- you mentioned the PFS.

I mean, maybe if the PFS is filed, you know, maybe you should

have filed your notice of removal then.  I don't know.

MR. KILARU:  We had a year to file.  I mean, it says

we have a year.  We filed it within the year.

THE COURT:  Well, no, you have 30 days from the time

that something --

MR. KILARU:  Yeah, the order that gave us -- the order

that made clear that there are -- that we can break out these

individual plaintiffs, who clearly don't have a claim against

Monsanto, was the order that Judge Smith issued.

1       **THE COURT:**  Why wasn't it, the PFS, filed by the

2   individual plaintiffs who showed that they didn't -- if those

3   PFSs showed that they didn't have legitimate claims against the

4   nondiverse defendant, why wasn't it the PFS the document that

5   should have triggered the 30-day clock?

6       **MR. KILARU:**  If a PFS is construed as an other paper,

7   I think that that would be -- I think it's not clear that the

8   PFS would be considered an other paper.

9       I think if the rule going forward is that a PFS would be

10  considered an other paper, then it would be the basis for

11  triggering removal.  And the PFSs are filed in the ordinary

12  course.  I think that would be helpful to avoid this problem

13  coming up in the future.

14      What we have here is sort of a situation where --

15      **THE COURT:**  I think you didn't -- I think the reason

16  you didn't remove on that basis is because you sort of had an

17  understanding that so long as these plaintiffs are jumbled

18  together in the same complaint and, you know, looking at all

19  the defendants and all the plaintiffs, there's not complete

20  diversity, we can't remove it.  And I think that's probably

21  right.

22      But, you know, to the extent that you're saying that the

23  PFSs disclosed that there was some sort of, you know,

24  fraudulent joinder or improper joinder, then the time to -- the

25  time to remove would have been then, I would think.

1    But to the extent you're basing your removal argument on,

2  you know, the order, Judge Smith's order, you know, I guess I

3  still think that the filing of the new complaint that she

4  required is -- you know, is the triggering event, because we

5  don't yet know what that new complaint is going to say.

6    And if you really wanted to be able to remove these cases,

7  you know, maybe you should have filed a motion in the superior

8  court earlier on saying, look, these are -- these things are

9  improperly joined.

10   And if the state court said, no, they're not improperly

11 joined, then again you're out of luck.  I know it's hard.  I

12 feel -- you know, again, I feel a real obligation in this case

13 to think about how it would apply in other cases.

14   **MR. KILARU:**  I guess it just seems an odd rule to me

15 that if the state court incorrectly determines that cases that

16 shouldn't be joined are joined that defeats our right to

17 removal, when it's clear that some of the plaintiffs don't have

18 a valid claim against the defendants that would be jurisdiction

19 and federal jurisdiction.

20   We cite a number of cases in our papers where, you know, a

21 removal was filed and the Court determines when the removal is

22 filed.  Looks at it, there isn't a valid claim against one of

23 the defendants, and so severs -- and so severs that plaintiff

24 off and says the other cases stay in the court.  Which is

25 exactly what I think we're asking for here, because we have an

order that says, effectively, these cases cannot continue as

consolidated.

     **THE COURT:**  Okay.  I'll think about it a little more.

  Is there anything anybody wants to add on this side?

     **MR. WISNER:**  I think Your Honor is also sort of --

what is the complaint right now that was removed to this court?

And that one doesn't have proper jurisdiction in this court as

it's written.

  So we have to see what the complaint looks like when

they're refiled, and then we'll see, okay, is there a proper

grounds for removal at that point.  And that's, I think,

exactly what you're saying.

     **THE COURT:**  Although, what about in a situation

where -- I know we're going kind of back and forth here.

     **MR. WISNER:**  Sure.

     **THE COURT:**  What about a situation where a state court

says, look, I'm concluding now that these cases are not going

to be tried together, but I'm not going to make you go through

the administrative hassle of filing separate complaints and

paying separate filing fees and all that; I'm just declaring

that, with respect to this complaint, these cases are all going

forward separately?

     **MR. WISNER:**  Well, then I think at that point it's

incumbent upon the defendants to file immediately to sever a

specific case because they believe it needs to be removed to

1    federal court --

2        **THE COURT:**  Why would they have to file a motion to

3    sever in state court first?

4        **MR. WISNER:**  They have to get not only a motion to

5    sever, they'd have to sever it and have a new case that's

6    properly removable brought to the federal court.

7        And there's mechanisms in state court to do that.  You can

8    get ex parte motions that get resolved in 24 hours.  I mean,

9    there's plenty of ways to deal with these issues on an

10   expedient basis.  They didn't do that.

11       And, you know, there was maybe a strategic shift in their

12   decision on how to litigate these cases.  That's fine.  But

13   saying, okay, now we have this order that they're going to be

14   severed at some point in the future and they're going to have

15   to file new cases -- and, you know, frankly, we're thinking

16   about how we're going to plead those new filings.

17       You know, maybe the Wilbur Ellis defendant, that they say

18   is fraudulent joined, isn't fraudulently joined.  I mean, we

19   have allegations that might relate to non-IT&O situations where

20   I think we could properly name them as a defendant even though

21   they didn't distribute that specific Roundup.

22       I think they're things that they've done, that we can

23   prove, and we have the evidence to back it up.  So, you know, I

24   think we -- I think we don't know.

25       I think we have to see what that complaint looks like and

see, okay, when that's removed, is there a proper basis for removal?  If it's one year from the commencement of the thing, well, sorry.  If it has properly diverse -- if it's not fraudulently joined, okay.

I think we have to look at it when we see it.  I think that's the right approach.

MR. KILARU:  And just on the point about whether we have to get a formal order from the state court severing to have a right to remove, I mean, I just think there's no legal support for that.

There's a number of cases we've cited in our briefs.  I think the *Martinez* case that we cite, but there are other examples; *Sutton*, *Greene*, *Baycol*.  In a lot of these cases, the severance happens by the federal court after some order by the state court, or it just happens in the context of removal.

THE COURT:  But isn't that kind of strange?  I mean, I really -- I guess I kind of question that.  I mean, you have -- you have one lawsuit, you know.  And the statute speaks in terms of removing actions; right?

MR. KILARU:  Right.

THE COURT:  And so you've got an entire lawsuit coming up to federal court even though, if you examine the lawsuit in its entirety, there's no jurisdiction.

MR. KILARU:  Well, I think what happens in these cases --

1     **THE COURT:**  We don't remand claims.  You know, we
2  don't remand parts of lawsuits.  We remand lawsuits.
3     **MR. KILARU:**  I think that that actually -- in the
4  sense of claims against multiple defendants or claims against
5  multiple plaintiffs, I think it is often the case that
6  individual pieces of a lawsuit, whether a particular
7  plaintiff's claim against a particular defendant or a
8  particular plaintiff's case, period, gets sent back.  I mean,
9  we have cited examples of that.
10     **THE COURT:**  I think there are examples of that.  I'm
11  just not sure they're right.  I'm not sure -- I'm not sure that
12  the courts correctly thought through that issue.
13     **MR. KILARU:**  I think on that I'd say if we look at a
14  complaint and we believe, based on sort of where things are in
15  litigation, and there's some development that would make a
16  defendant believe that the case has been fraudulently joined
17  and that there's a party that shouldn't be attached on either
18  side of the V, that there are many examples -- and I think this
19  is the right thing to do -- of removing those cases.
20     And the courts then assessing -- the federal courts
21  assessing whether those arguments are valid.  Because,
22  otherwise, you get into the exact problem of, if you constantly
23  have to wait on the state court to issue some kind of
24  definitive ruling to trigger a right to removal, you may never
25  have a right to remove at all.  I think that's what these cases

reflect.

            **THE COURT:**  What are the cases -- why don't you sort
of tally the cases that you want me to go back and look at on
that point.

            **MR. KILARU:**  Sure.  Let me put together the briefs in
the cases so I can give citations.

        So there's the *Sutton* case, which if I can just grab --

            **THE COURT:**  Just give me the names.  I know they're in
your papers.  I haven't read all the cases in your papers.

            **MR. KILARU:**  I think I have everything in one place
though.  Give me one second.

        There's *Sutton*, which is 251 FRD 500.

            **THE COURT:**  I don't need the cites.  Just give me the
names.

            **MR. KILARU:**  There's a *Greene* case, G-r-e-e-n-e.
*Baycol*, B-a-y-c-o-l.  *Morris*, M-o-r-r-i-s.  *Martinez*,
M-a-r-t-i-n-e-z.

            **THE COURT:**  And those are the cases that stand for the
proposition that it's okay to sort of pull up -- pull one
lawsuit out of state court where, you know, if you consider the
lawsuit in its entirety, there's no jurisdiction, but then kind
of separate it out in federal court and send part of it back
down to state court?

            **MR. KILARU:**  Yeah, so I think *Martinez* and *Baycol* come
to mind, but they're a case where a plaintiff filed suit

against a group of defendants.  One of those defendants is from

the same state as the plaintiff.  The Court concludes that

there's no basis for a claim against that defendant, the

diversity-defeating defendant, dismisses them, and keeps --

(Unreportable simultaneous colloquy.)

**THE COURT:**  -- cases?

**MR. KILARU:**  -- the case in federal court.

I'm not sure.  I guess so, in the sense that they say --

so, for example, in *Martinez* the case goes up.  And McKesson,

which was the distributor defendant in that case that defeated

diversity, files a declaration, I believe -- it was either a

declaration or an affidavit -- saying, we don't distribute this

product, we've never distributed this product in this state.

And on that basis the Court says we're going to deny a motion

to remand because McKesson shouldn't be in the case.

**THE COURT:**  That's a little different, though, from

pulling up a case out of state court, multi-plaintiff case, and

then sifting through the case and deciding which plaintiffs can

stay in federal court and which plaintiffs should go back to

state court.  Because that's effectively what you're asking me

to do here; right?

**MR. KILARU:**  I think *Baycol* is similar to that then.

I think there was a group of plaintiffs, one of whom was in

state with the defendant.

All the cases go up.  The Court determines that they don't

believe that that plaintiff's claims have enough in common with the other plaintiffs, and so they send that one back, I guess, and they --

    **THE COURT:**  I will certainly read the case, but that sounds wrong to me.  That sounds wrong.  It sounds like that entire case should have been remanded because there was no jurisdiction over the action.

    But I'll give it a little more thought.  I understand that it's important, not just for the ten motions here but other motions in other Roundup cases as well as other cases.

    **MR. WISNER:**  Your Honor, on the other side of that, legally, there's actually cases that say you cannot do that. You can't break up the plaintiffs.  And we've cited it in our briefs.

    The *In Re Pradaxa* case, which is exactly on point, says you cannot -- basically, the argument is you have to use Rule 21, right, to sever out the plaintiffs.  But you don't get to get to Rule 21 unless you have jurisdiction.  And so if you don't have jurisdiction, you go back.

    And there's the *In Re Pradaxa* case.  There's the *Garby versus Diamond Kaiser*, Seventh Circuit case they discussed in passing.  And the *Moore v. McKesson Corp*.

    **THE COURT:**  Okay.

    **MR. WISNER:**  Thank you, Your Honor.

    **THE COURT:**  I'll give that a little more thought.

So what should we turn to now?  The issue of how to manage all of these cases in the MDL?  Is that next on the list probably?

**MS. WAGSTAFF:**  Sure, Your Honor.

**MR. STEKLOFF:**  Yes, Your Honor.

**THE COURT:**  Okay.  I sort of put out a tentative plan somewhat similar to what you proposed, not exactly what you proposed.  Very different from what you proposed.

So what's wrong with my plan?

**MR. STEKLOFF:**  Well, I think, Your Honor, what we -- you know, and we made this point in our brief, so I don't want to belabor it, but I think, as you know, this is a national litigation.  There are cases filed all around the country.

We have three data points now.  Only one federal data point, to be clear, but three data points in California; specifically, in the Bay Area.

Even this morning we heard that there will be more data points in the JCCP, in state court in California, either potentially in Alameda or, if it gets remanded, around the state.

I think that plaintiffs' counsel has said to Judge Smith that they have at least three more cases where they haven't filed them yet, but they plan on seeking preferential treatment.  So we know there are going to be a number of trials in California.

And what our plan sought was to get data points outside of California because I think it's important given that the litigation has been filed all around the country.

**THE COURT:** But California is a pretty diverse state. I mean, if we start with the California cases -- and the reason -- I'll just tell you. I can't remember if I put this in the order or not, but there are two primary reasons that I propose to start with California.

One is that -- what's the plaintiff's name? Is it --

**MR. STEKLOFF:** Giglio.

**THE COURT:** Giglio? That plaintiff is in the Southern District of California; is that correct?

**MS. WAGSTAFF:** That's correct, Your Honor.

**THE COURT:** So that was one reason to start with California, is that there's one plaintiff who's dying, who we want to get to trial as soon as we can.

The other is just that on some level it would be easiest to adjudicate the summary judgment motions in those cases because we're applying California law, which is what we already did in the first three. Right?

So, you know, but the cases would go to the Southern District of California, to the Central District of California, to the Eastern District of California. It's a very diverse state.

You know, to the extent that you think you might be able

1  to win in other jurisdictions that are less like the Bay Area,

2  you're going to be sent to those jurisdictions within

3  California.

4      So I guess I'm not -- you know, plus, you're going to be

5  doing these trials in Missouri.  Right?  There are these state

6  court trials that are scheduled in the fall in Missouri.  So

7  the data point argument that you make, I don't really find that

8  persuasive.

9      **MR. STEKLOFF:**  But there's other law that applies to

10  other individuals in terms of what the test is for a

11  substantial contributing factor --

12      **THE COURT:**  And we're going to adjudicate those

13  questions on summary judgment here.  Right?

14      **MR. STEKLOFF:**  I understand that, but in terms of

15  trials, just as an example, having different law -- it's not

16  just jury pools.  I understand why that is an issue.  But it's

17  not just jury pools.  It's also the operating law that applies

18  as well.  And so --

19      **THE COURT:**  So what would be your favorite state to go

20  to?

21      (Laughter)

22      **THE COURT:**  What would be -- if we were to pick a

23  first state, what would it be?

24      **MR. STEKLOFF:**  You're putting me on the spot.  On the

25  law, it's typically defendants say Texas or Michigan.  On the

facts here, I would probably pick, you know, where glyphosate
is used heavily in agriculture.

THE COURT:  North Pole?

MR. STEKLOFF:  For all the benefits that it provides,
particularly in agriculture places, where it's used everywhere
and people aren't developing non-Hodgkin's lymphoma, in our
view.

THE COURT:  So isn't that like Missouri?

MR. STEKLOFF:  Well, we will be going to Missouri, but
here we're here to deal with the federal cases.

And so, look, there were many California cases that were
part of our plan under what we proposed with the first in/first
out.  We weren't saying --

THE COURT:  No, I understand.  I just don't -- from my
standpoint, from the standpoint of managing the MDL, I don't
think -- you know, to the extent there are meaningful
differences in the law of causation in the different states, I
don't think it makes sense to be -- to do the first in/first
out approach because then, with each wave of cases, I'm going
to have to sift through the law of, you know, 20 different
states and try to differentiate.  It's going to be like a
Rubik's Cube.

MR. STEKLOFF:  That's why I think, based on your order
yesterday, an alternative plan would be to include California
but pick a few other states.  And I don't know the magic

1   number, whether it's three or four.  Work those cases up.

2       I mean, both sides agreed -- actually, that wasn't even

3   negotiation.  When they proposed their plan first and sent it

4   to us, they had 50 cases that they expected to be remanded back

5   as part of their plan.  We also independently had approximately

6   50 plaintiffs who would have been remanded back.

7       **THE COURT:**  So is that to say that there are only 50

8   California cases?

9       **MR. STEKLOFF:**  No.  I actually wanted to flag that.  I

10  think in their plan there were 16, including Giglio and Stevik.

11  But there may be other California cases filed, for example, in

12  the Eastern District of Missouri, where -- I mean, there are

13  choice-of-law issues, but there may be plaintiffs who used

14  Roundup or were diagnosed with non-Hodgkin's lymphoma in

15  California, but, nonetheless, filed in the Eastern District --

16      **THE COURT:**  Yeah.  We started looking at that in the

17  last couple of days and came to the conclusion that if a

18  California plaintiff was exposed in California and filed a

19  lawsuit in Missouri, under Missouri choice of law law,

20  California law would apply.

21      And so that's the assumption we're going to operate on

22  unless you present something -- or unless either side presents

23  something to the contrary.

24      So, in other words, if a Californian filed a lawsuit in

25  Missouri, we're going to assume California law applies, so that

1    would be in the California group.

2         **MR. STEKLOFF:**  Understood.

3         **THE COURT:**  And that would result in -- presumably,

4    that would result in the case -- that case going back to

5    Missouri.

6         **MR. STEKLOFF:**  I agree with that.

7         **THE COURT:**  And maybe there would be some other

8    California -- are there other states?  No, probably just

9    Missouri; right?

10        **MR. STEKLOFF:**  I have not checked since the order came

11   out last night, but I think it's most likely either in

12   California or in Missouri.

13        **THE COURT:**  Missouri.

14        **MR. STEKLOFF:**  Yeah.

15        **THE COURT:**  So in the first wave, we'd be -- under my

16   plan, we would be sending cases back to their home districts in

17   California and perhaps some handful of cases to Missouri for

18   trial.

19        **MR. STEKLOFF:**  And I guess --

20        **THE COURT:**  But under California law.

21        **MR. STEKLOFF:**  You could also have a plaintiff who now

22   lives in Arkansas but used Roundup in California, was diagnosed

23   with non-Hodgkin's lymphoma initially in California, has

24   subsequently moved.  And then you have to look at the --

25        **THE COURT:**  The problem you identify of the trial

1    applying California law remains; right?

2            **MR. STEKLOFF:**  Yes.

3            **THE COURT:**  So that doesn't address the problem that

4    you're concerned with.  So you're saying we would want to

5    add -- like maybe let's do California and one other state.

6    Like pick your best state.

7        I mean, I guess, in theory, I don't have an objection to

8    that, so long as it's manageable.

9            **MR. STEKLOFF:**  And I think we could make it

10   manageable.  I read your order.  I'm not pushing for first

11   in/first out.

12           **THE COURT:**  The key to making it manageable, I have a

13   feeling, is how reasonable is Monsanto going to be in the case

14   management process; right?

15       Because, you know, you could imagine a defendant trying to

16   make unimportant differences between cases seem important and

17   saying, you know, these 50 cases are all very -- you know, here

18   are ten distinctions between each of these cases and the cases

19   you already ruled on.  And, you know, most of those differences

20   are really not meaningful.

21       Or you could kind of play ball in the MDL and say, all

22   right, we concede -- preserving our appellate rights, we

23   concede your prior summary judgment rule applies to these 40

24   cases, but for these five cases we believe that there's

25   something meaningfully different that requires you to

adjudicate.

So, you know, I think -- so, in theory, I don't have a problem with taking a shot at, you know, doing California and another state.  But if it seems like it's too much, then I would think we would revert to just looking at California or just the Southern District of California or something like that.

MR. STEKLOFF:  And so maybe what I would propose is that, you know, within a week we make a proposal about another state or another two states.

And that will also help you know the number of cases that just -- you know, might not be perfect because we're not -- I don't know that we're able to go through all the Plaintiff Fact Sheets, but generally how many cases are filed in a certain jurisdiction with the expectation that that law applies.  And then --

THE COURT:  Presumably, you would want to pick -- I mean, you would want to pick a state where you think the law on causation is different --

MR. STEKLOFF:  Correct.

THE COURT:  -- is more -- you know, more favorable to defendants.

MR. STEKLOFF:  Yes.

THE COURT:  And is it really true that there are only around 50 California cases of the 1300 cases that we have?

          **MS. WAGSTAFF:**  So in our proposal we had listed all of
them, and there was 16.

          **THE COURT:**  16?

          **MS. WAGSTAFF:**  16 actually directly filed into a
California district.

          **THE COURT:**  Oh, I thought there were a lot more than
that.

          **MR. STEKLOFF:**  Their 50 were the whole Ninth Circuit.
So when you broke it down, of the California districts it was
only 16.

          **THE COURT:**  Okay.

          **MS. WAGSTAFF:**  And there are ten in the
Central District.

          **THE COURT:**  Right.  I saw the breakdown within
California.

     So that makes me think that it may well be manageable to
do California and one or two other states in the first wave.

          **MR. STEKLOFF:**  Right.  Because I think that 50 number
that both sides independently reached is a realistic number.

     And I realize we shouldn't do eight states because then
the burden it would put on you.  But I think we could
accomplish it with -- I don't know whether the magic number is
two, three, or four, but I think we go back and look and can
make a proposal.

          **THE COURT:**  Well, the other thing you may want to do

1  is you may want to look at the states and say-- I guess, here's

2  what I would be inclined to do is, California law and one other

3  law.  Okay?

4      So you might say -- you might identify two states where

5  you say the law in those states is different from California,

6  but they're identical to one another.  And if the parties

7  stipulate to that, then I can just -- I don't have to pay

8  attention to which state the case is coming from.  I can just

9  read the cases and apply the law.

10     And, you know, maybe we could do -- maybe something like

11 that would work.  But I think maybe -- and particularly if it's

12 only -- if we're only talking about, you know, 16 cases from

13 California and then five cases from some other state or

14 something, that might work.

15         **MS. WAGSTAFF:**  And so, Your Honor, I would ask that

16 plaintiffs get to propose a state, or we jointly propose a

17 state, or we propose two states.

18     The reason why we proposed California is because we're

19 here.  And Monsanto had refused to wave *Lexecon*, so the Court

20 has spent most of its time --

21         **THE COURT:**  You refused to wave *Lexecon* too.

22         **MS. WAGSTAFF:**  Well, we didn't have to.  We had

23 Mr. Hardeman.

24         **THE COURT:**  I know, but you refused to wave *Lexecon*.

25         **MS. WAGSTAFF:**  Some plaintiffs have, yes.  But, for

1    example, Mr. Giglio has said he will try his case up here.

2           THE COURT:  Oh, yeah.  Right.

3           MS. WAGSTAFF:  So that's why we went down the

4    California path in the first place.  Right?  And so that's sort

5    of why we agree with you that --

6           THE COURT:  I think we're going to let Monsanto pick a

7    state.  Things have been going pretty well for you.

8           MS. WAGSTAFF:  All right.

9           THE COURT:  Let's give Monsanto a chance.

10       So I think that's fine.  So I assume -- I mean, are the

11   vast majority of these cases from Missouri?

12          MR. STEKLOFF:  I think the vast majority of the cases

13   have been filed in Missouri in the federal MDL, but I think

14   that runs into the issue of -- I don't think that necessarily

15   means that Missouri law applies in the vast majority of those

16   cases.

17          THE COURT:  Got it.

18          MR. STEKLOFF:  And so cases have been filed -- I think

19   we put in our paper over 50 districts around the country, so it

20   really is nationwide.  But I do think if you look at a

21   percentage, there are a large number of cases that have been

22   filed in the Eastern District of Missouri.

23          THE COURT:  Okay.  Let's say that we decide that it

24   would be workable to do California and one other state at the

25   same time.  I'm talking about not where the cases are filed but

what law applies.  Right?

And the goal is to adjudicate summary judgment motions on those cases, figure out which of those cases my prior summary judgment rulings apply to and which cases have significant differences that require further adjudication other than me saying the motion for summary judgment is denied for the reasons stated in my prior ruling.  Right?

And that's the goal.  Right?  As many cases as we can identify where we say summary judgment is denied for the reasons stated in my prior ruling, the faster we can get those cases out to trial and, hopefully, to a state that, you know, you think might be a little better.  So that's really the goal.

But perhaps there will need to be some individualized adjudication of some of these summary judgment motions.  So how soon can we do that?  When can we get those adjudicated?

**MS. WAGSTAFF:**  So I propose that we put a CMO proposal to you within ten days.

**THE COURT:**  Case management order proposal?

**MS. WAGSTAFF:**  Yeah.

**MR. STEKLOFF:**  I think it's worth us meeting and conferring.  I think on the macro issues of state law, whatever other jurisdiction is chosen, we may be able to put those on a different track.

Obviously, there will be individual issues, as you just mentioned, like statute of limitations, that will require the

discovery of the plaintiff or the doctors that may then raise different summary judgment issues.

So I just want to differentiate there's sort of the macro -- is this, you know, failure to warn claim valid under California law?  I think that was one of the issues raised in the Hardeman -- before the Hardeman trial, which you denied.

But then there are like the Gabayou statute of limitations issue, which require the deposition of Mr. Gabayou and his doctor, for example.  So that's going to be -- I would think either we do it all in one track or potentially on a different track.

We can also discuss in our discussions, once we know the number of cases, how long it will take to do discovery of plaintiffs, of the treaters, of family members.  And then obviously there will need to be expert disclosures as well.

THE COURT:  My view is that -- as I've previously expressed, my view is that getting these cases going and getting the summary judgment motions adjudicated and getting them out for trial is a bigger priority.  And my time is better spent on that than trying another case.

And so I want to set an aggressive schedule for making that happen.  So, I mean, what are you thinking in terms of ballpark?

MS. WAGSTAFF:  So your order just came out last night, but I spoke with the plaintiffs' leadership team and we were

1   thinking if it was just going to be the 16 California cases --

2   well, actually, taking Stevik out, *Daubert* sometime around

3   October.

4          THE COURT:  *Daubert* summary judgment in October?

5          MS. WAGSTAFF:  Yeah.  And with the hope that today you

6   would order that those cases would be unlocked from the

7   discovery stay.

8          THE COURT:  Does that sound about right?

9          MR. STEKLOFF:  I think we add cases -- I think

10  sometime this year sounds about right.  I don't know if October

11  sounds about right.

12      But, you know, there are a number of depositions that need

13  to happen in every case.  And then you need experts in every

14  case, both general causation experts, which I do not believe

15  should be locked in from something that happened a year and a

16  half ago, and then specific causation experts to assess the

17  depositions, to assess the medical records.

18      We have to collect medical records, which on our side is a

19  time-consuming process.  So I'm not suggesting it should take a

20  year, but, you know, I think this year -- sometime this year,

21  ballpark, makes sense.

22          MS. WAGSTAFF:  And, Your Honor, we could start with

23  the California cases.  And while we're figuring out the second

24  state, we could sort of stagger that maybe 60 days behind or

25  something like that.

1    **THE COURT:**  Well, I certainly see no problem in

2  lifting the discovery stay for the California cases right now.

3    **MS. WAGSTAFF:**  Okay.

4    **THE COURT:**  And that could be the 16 California cases

5  and any other cases that both sides agree are governed by

6  California law.  And so then the nice thing about that is then

7  you can go back and look at, well, how many other cases are we

8  talking about?

9    So how many cases -- again, it would still be governed by

10  California law, so it doesn't quite get at your problem.  But,

11  yeah, I mean, I think we can agree on that now, that the

12  discovery stay for those 16 California cases and any other

13  cases governed by California law is lifted now.

14    And you guys should start cranking on those cases and

15  getting them ready for summary judgment and *Daubert*.  Again,

16  it's just the *Daubert* motions that are intertwined with summary

17  judgment that I want to deal with.

18    Did that make sense to you?

19    **MR. STEKLOFF:**  A little more clarification might help

20  in terms of what you were proposing.

21    **THE COURT:**  Right.  Well, for example, I mean, there

22  are a number of other motions to exclude expert testimony in

23  the last trial --

24    **MR. STEKLOFF:**  Uh-huh.

25    **THE COURT:**  -- right? -- where my granting or denying

the motion wouldn't have affected summary judgment.  It might have affected how -- you know, it would only have affected what evidence came in at trial.  I think those issues should be left for the trial judges, is my instinct anyway.

      **MS. WAGSTAFF:**  So to put a point on it, you're talking about Dr. Sawyer or Dr. Benbrook, those types of experts?

      **THE COURT:**  Right.

      **MS. WAGSTAFF:**  You do not contemplate us disclosing them at this time?

      **THE COURT:**  I mean, we can have a discussion about whether you should be disclosing them.  And we may, in fact -- we may want to for Giglio --

      **MS. WAGSTAFF:**  Giglio.

      **THE COURT:**  Giglio, sorry.  For Giglio, we may want to set a more aggressive schedule that gets it even more ready for trial in San Diego or the Southern District of California.

    But, generally speaking, I would -- I wasn't referring to disclosure of experts as much as I was adjudication of *Daubert* motions with respect to those experts.

    Those experts -- I think the trial judge should decide those questions because the trial judge should be in complete charge of how the trial is going to go; you know, whether the trial is going to be bifurcated or not.

    I'm sure I'll start getting a lot of calls about that from judges around the country at some point, but that should be

1    their decision.

2        And, you know, whether Benbrook can testify or whether

3    somebody can testify about the EPA's, you know, regulatory

4    system, that's for the trial judge to decide, I would think.

5        **MS. WAGSTAFF:**  Understood.

6        **MR. STEKLOFF:**  On that point of bifurcation, my

7    understanding is that when you remand the cases an order goes

8    along with that in which -- within which we would request that

9    you -- you know, I don't think you can order judges to follow

10   bifurcation, but recommend bifurcation based on your experience

11   post Hardeman.

12       And so I'm just putting a pin in that, that when that

13   comes out, which -- whenever it is, I think that we would

14   request that.

15       **THE COURT:**  I mean, if somebody called me and asked

16   me, I would say I think that aside from the misconduct in the

17   opening statement, that bifurcation worked well.  It's a little

18   more challenging for the judge, but I think it's a -- I think,

19   you know, I think it worked well.

20       But whether to put that in a memo or something, I don't

21   know.  I don't know if that's appropriate.

22       **MR. STEKLOFF:**  On the specific causation *Dauberts*,

23   Nabhan or Weisenburger, I just want to preserve -- I understand

24   the sort of operating presumption that Ninth Circuit law will

25   govern -- if you're ruling on those, will govern your decisions

there.

And we can litigate this later, but I think there are cases that go other ways, as well, as the case is coming.

**THE COURT:** Yes.

**MR. STEKLOFF:** The California case, I understand, but if it's a different --

**THE COURT:** And that's incumbent on you. I mean, that is my understanding of the law, that Ninth Circuit *Daubert* standard governs regardless of where the case comes from. So it's incumbent upon you to convince me otherwise, you know, if you think I'm wrong about that.

And so the presumption we're operating under, the status quo right now, is that Ninth Circuit law is governing. So the onus will be on you.

**MR. STEKLOFF:** Yes. Understood. And I'm flagging it. It's probably something we'll raise and hopefully convince you, but understanding. I just wanted to flag that as something. I don't want to waive that issue, I guess, is my point.

**THE COURT:** Right. Fair enough. Yeah. I was assuming you would raise that.

Okay. So we're thinking -- so just in looking at my calendar, I'm thinking November is the right time to do -- let me ask you this. I mean, I've been operating on the assumption, but I want to make sure we're on the same page, that no further *Daubert* hearings would be necessary.

1    **MR. STEKLOFF:**  I think we need to see what the reports

2  are and what the methodology is.  I mean, I expect it will be

3  the same, and self-fulfilling from my perspective.

4       So, I mean, I think that's probably right, but I don't

5  want to waive that now if, for example, the methodology is

6  changed or there's a new expert that raises, you know, facts

7  that we haven't seen before that raises new issues.

8       **THE COURT:**  Right.

9       **MR. STEKLOFF:**  So I think a presumption that we don't

10  need the full evidentiary hearings that we've already had, I

11  mean, I don't know if we'll need to discuss these -- not in

12  California but in other jurisdictions, the legal issues about

13  which law applies in terms of which circuit.  I think it's a

14  little premature, but I guess I understand the presumption.

15       **THE COURT:**  Okay.

16       **MS. WAGSTAFF:**  So do you want us to submit a proposed

17  case management order within ten days?

18       **THE COURT:**  Yeah.  I mean, I'm trying to decide

19  whether that makes the most sense or if it makes the most sense

20  to have you back in a week or so to hammer it out.

21       **MS. WAGSTAFF:**  Could we try for a week and then get on

22  a telephone call with you, and we can tell you our progress?

23  And if you want us to come back, we can.

24       **MR. STEKLOFF:**  I think with your guidance of

25  November -- we agree on things every once in awhile, so I

wouldn't be surprised if we can make significant progress.  And

at least, at a minimum, we'll only be able to flag a couple of

disputes for you.

You know, if we were debating totally different time

periods, it would be different, but with that guidance, I think

we might be able to resolve a lot of it.

**THE COURT:**  Okay.  Why don't we have a -- what's

today?  Wednesday.  I'm looking at my calendar.

Next Wednesday I have a motion to dismiss hearing in my

other MDL, Cambridge Analytica MDL.

Why do I agree to all these MDLs?

(Laughter)

**THE COURT:**  Why don't we have -- do me a favor.

Here's what we'll do.  Submit a -- why don't you submit a

proposed case management order on the 29th.  Okay?

And then we will look at it, and if we want to call you in

to talk or talk by phone or whatever, we'll probably set

something up for the following week, the week of the 3rd.  It

can be by phone.  Telephone is fine, I think.

**MS. WAGSTAFF:**  Okay.

**MR. STEKLOFF:**  When should Monsanto submit this other

state --

**THE COURT:**  With that --

**MR. STEKLOFF:**  On the 29th?

**THE COURT:**  On the 29th.

1          **MR. STEKLOFF:**  Okay.

2          **THE COURT:**  And, you know, you can send a letter

3    explaining whatever you want to explain and all that.

4        So should we be setting -- should we also be setting a

5    schedule for like the next wave of cases at this time?  Or

6    should we wait and do that later?

7          **MS. WAGSTAFF:**  Well, I think if we're going to set 50

8    cases, we should wait.

9          **THE COURT:**  Doesn't have to be 50.

10         **MS. WAGSTAFF:**  Or around there, we should probably

11   wait.

12         **MR. STEKLOFF:**  Well, under what you said, we have 16

13   in California.  And Stevik is one of them.  So, really, we have

14   15 that we have to work up.  And Giglio has already started

15   with some of the preservation depositions.  So it's 14 and a

16   half.

17       I think you said pick a state.  I mean, you said five.  So

18   I think we have a little leeway.

19         **THE COURT:**  Yeah.

20         **MR. STEKLOFF:**  So I think maybe a second wave -- I

21   mean, I'm fine with the state-by-state approach where we find

22   some other states.  Seems like a good idea.

23         **THE COURT:**  Why don't you set a schedule for a second

24   wave too.  And why don't you -- why don't you identify -- you

25   know, you each pick a state.  Okay?  Why don't you each pick a

state.

     And for the second wave, can you please try to make it just one law?  Try to identify a couple of different states where the law is the same.

          **MS. WAGSTAFF:**  We'll try.

          **THE COURT:**  Because I think it really -- you know, and if you can't, then just pick one state, because I think it will be much more difficult to rip through these if I'm applying two different sets of law to them.

          **MR. STEKLOFF:**  So each side picks one law even if there are multiple states that fall into that law?

          **MS. WAGSTAFF:**  He wants us to agree on the law.

          **THE COURT:**  Yeah.  I mean, I want -- it may be simpler to just pick -- you know, for the second wave, you pick a state.  And for the third wave, you pick a state.  You take turns picking states.  That might be the easiest way to do it.

     But I think you should do some research on the law and see if you can group the states based on the law and say that -- you know, you can say, hey, you know, New York, New Jersey, and Illinois have the same causation law, we can put all those together.

          **MR. STEKLOFF:**  Okay.

          **THE COURT:**  That would be the ideal thing.

     So I guess, you know -- but I think one law per wave. Even if you're setting them on a fairly accelerated schedule,

more accelerated than if a bunch of states were grouped together, I think that would be preferable. Have one law per wave.

And you can pick the second one. You can pick the law for the second wave.

**MR. STEKLOFF:** Okay. Thank you. When should we submit that?

**THE COURT:** Can you submit it on the 29th also?

**MR. STEKLOFF:** Yeah.

**THE COURT:** Okay.

**MS. WAGSTAFF:** On the 29th, can we also include an individualized proposed CMO for Giglio that's a little more accelerated?

**THE COURT:** Yes. Yes, please.

**MS. WAGSTAFF:** Okay.

**THE COURT:** Again, I still think that the judge in the Southern District of California should be deciding all pretrial motions that will merely affect how the trial is going to go.

But that doesn't mean that you shouldn't do expert reports for those -- you know, you can get it all ready, you know, up to the pretrial conference, basically.

**MS. WAGSTAFF:** Okay.

**MR. STEKLOFF:** And I think that the judge there has to decide the trial setting as well. So I understand working faster so you can remand it more quickly, but in their papers

1  they keep --

2         **THE COURT:**  I'm not going to be consolidating any

3  cases for trial.  I'm not going to set any cases for trial in

4  other districts.

5         **MR. STEKLOFF:**  Okay.  Thank you.

6         **MS. WAGSTAFF:**  So the judge down there is Judge

7  Moscowitz, in case you were interested.

8         **THE COURT:**  Oh, okay.

9         And then, I guess, related -- somewhat related to this

10  issue of pulling out the Missouri cases, which may have the law

11  of various different states applying to them, is the fact that

12  there are -- I believe in this MDL we have a number of

13  complaints that are multi-plaintiff complaints.

14         I would apply the same standards that Judge Smith applied,

15  which is that all of those should be severed unless there's a

16  situation like --

17         **MS. WAGSTAFF:**  The Pilliods.

18         **THE COURT:**  Like the Pilliods, yeah.  Even the

19  Pilliods, I'm not so sure, to be honest with you.

20         But at a minimum I would require the filing of -- and I'll

21  just go ahead and order this now -- that for all

22  multi-plaintiff cases there needs to be a new complaint filed.

23  It can be some sort of short-form complaint.

24         There was -- there's an MDL where that procedure was

25  followed, where -- I can't remember which one it was as I sit

here.  But where the judge said, no, these multi-plaintiff complaints all have to be severed, but we're going to create some sort of short-form complaint process for you to use.

So, Jordan, do you remember which case that was off the top of your head?

**LAW CLERK:**  *Talc Litigation* case in the District of New Jersey.

**THE COURT:**  Yeah.

**MS. WAGSTAFF:**  So, Your Honor, since we don't have direct filing here, are you anticipating that if a District of Colorado case came here, we would just file short-form complaints directly into the Northern District?

**THE COURT:**  That's what I'm assuming happened in the *Talc* case.  And that's what I was envisioning here.

**MS. WAGSTAFF:**  Okay.

**THE COURT:**  But I forgot to look at the details of how they did that in New Jersey.  But, anyway, that's going to have to happen.

I don't -- you know, I don't know how important it is that that happen immediately.  I don't think -- you guys have enough to work on in the next seven days that, you know, you don't necessarily have to worry about that.

Why don't we go ahead and schedule another case management call the week of June 3rd.  And that will be on the agenda, is we're going to make a decision in that call about how to get

all the cases severed, all the multi-plaintiff cases severed.

How about 9:00 a.m. on June 5th?  Not good?

**MS. WAGSTAFF:**  Your Honor, the 5th is the only day that's bad for me.

**THE COURT:**  How about the 4th?

**MS. WAGSTAFF:**  That works.

**THE COURT:**  9:00 a.m., June 4th?

**MR. STEKLOFF:**  Yeah.  I may be unavailable, but I am quite confident there is someone who can -- you know, Mr. Kilaru and others can handle this.

**THE COURT:**  We can also do the 3rd.  Is the 3rd better?

**MR. STEKLOFF:**  The 3rd is better for me.  I mean, you shouldn't schedule it around me, but I am probably available on the 3rd.

**THE COURT:**  Let's do the 4th if you're unsure about the 3rd also.  Let's do the 4th at 9 o'clock.

**MR. STEKLOFF:**  While your calendar is open -- and I hate to do this -- we will make July 1st or 2nd work, Your Honor, for the Hardeman post trial, but I just wanted to -- I recognize the conflict that I have, and I think I should be a part of that that week.

And I'll be here if that's the only time that works, but I just wanted to throw out, looks like the briefing will be finished on the 21st.  So understanding you would need enough

time to review, Ms. Wagstaff and I discussed the possibility of either June 26th, 27th, or 28th, or July 8th.

Ms. Wagstaff has a vacation after July 8th.

**THE COURT:** 26th, 27th. What were the other dates?

**MR. STEKLOFF:** June 26, 27th, or 28th, or July 8th.

**THE COURT:** July 8th is probably not going to work. 27th and 28th definitely don't work. 26th probably doesn't work.

**MR. STEKLOFF:** Okay.

**THE COURT:** But we'll look. So let's keep it where it is, but we'll give it some more thought and see if we can rearrange some things and make it happen either on the 26th or the 8th.

**MR. STEKLOFF:** The 25th or 24th, I think, works as well, but I especially didn't want to stand up and tell you that you had only the weekend to review the papers, with the reply brief coming in on the 21st. But that whole week, I think, was open for us.

**THE COURT:** Okay. We'll give it a little thought.

**MR. STEKLOFF:** Thank you, Your Honor.

**THE COURT:** Let's see. Anything else to discuss?

**MS. WAGSTAFF:** We need a trial date for Ms. Stevik.

**THE COURT:** Oh, yeah. I was thinking probably February. February of 2020.

**MS. WAGSTAFF:** Mr. Brake is going to address that.

1    **MR. BRAKE:**  Yes, sir.  We'd like it sooner if

2    possible.  But if that's the earliest that Your Honor is

3    available, then that's what we'll do.

4    **THE COURT:**  Yeah.  Again, it's mainly just because I

5    think that it is -- you know, all of it is a priority.  I

6    understand that all of it is a priority.

7    But I think, from an MDL management standpoint right now,

8    it's a greater priority to get these California cases and cases

9    from one other state out and trial ready.

10    **MR. BRAKE:**  I understand.

11    **THE COURT:**  And so I think -- I believe that -- I

12    discussed this with Kristen yesterday, and I believe that we

13    came down on February 10th.

14    So what I will do is I will go ahead and set the trial

15    date for -- the first day of trial for February 10th, with the

16    understanding that you may hear from us that, you know, it may

17    be February 18th or maybe February 3rd or something.  I may be

18    off by a week or so, but I'm pretty sure it was February 10th.

19    **MR. BRAKE:**  Okay.

20    **THE COURT:**  And then jury selection I think we'll do

21    on February 5th.

22    How many jurors do you want to pick this time?

23    **MR. BRAKE:**  Haven't thought about that.  We need more

24    than -- we need to leave some room, obviously.

25    **THE COURT:**  You all objected to ten last time.  It

1  almost came back to bite you pretty hard, didn't it?

2      All right.  Well, you have some time to ponder that.

3      Let me see if there was anything else I wanted to talk

4  about.

5          **MS. WAGSTAFF:**  Your Honor, we had one more --

6          **MS. GREENWALD:**  One issue.

7          **THE COURT:**  One sec.

8      Were you going to bring up the preservation depos?

9          **MS. GREENWALD:**  Yes.

10         **MS. WAGSTAFF:**  Yes.

11         **THE COURT:**  So my view of that is that obviously that

12  can't be forced upon anybody.  But it does strike me as

13  potentially a good idea to do preservation depos that, you

14  know, if a trial judge approves it and if the parties agree to

15  it, could obviate the need for, you know, individualized

16  testimony in a particular trial.

17     But, like I said, I don't think -- I assume that I can't

18  force that upon either side, and I think it would be

19  inappropriate to, given -- I mean, look, we had that Zang, et

20  al. meta analysis come out, you know, a month before trial last

21  time; right?  And we're going to continue -- and now we've had

22  the EPA put out an analysis since the trial; correct?

23         **MR. STEKLOFF:**  Yes, Your Honor.

24         **THE COURT:**  Did the jury in the Alameda County trial

25  learn about that?

1          **MR. STEKLOFF:**  No.  Monsanto sought to admit it, and
2    Judge Smith, I think, just given the timing, it happened --
3          **THE COURT:**  Like in the middle of trial or something?
4          **MR. STEKLOFF:**  -- did not let the jury hear about it.
5          **THE COURT:**  And, obviously, that stuff -- you know,
6    new stuff will be weaved into people's testimony oftentimes, I
7    would think.
8       But I just -- part of me wonders if, you know, it would be
9    appropriate to have kind of generic preservation testimony just
10   to keep options open for all involved.
11         **MS. GREENWALD:**  I think that's all we're asking, Your
12   Honor.  We're not saying that there should be an admissibility
13   decision now.  We're not saying that it wouldn't be subject to
14   their -- Monsanto's objection at any given trial.
15      And, of course, they can do the same thing.  It's to have
16   it if something comes up that we need it, and we have to make
17   an application to the Court at the time and convince the Court
18   that it can or can't be used.  It would be an individualized
19   decision with each case.
20      And, presumably, we would always rather have someone in
21   person.  It would really only be used if circumstances make it
22   impossible or virtually impossible.
23         **THE COURT:**  And the idea would be that this would be
24   testimony -- I mean, obviously, it would be testimony about
25   general causation.

1          **MS. GREENWALD:**  Only.

2          **THE COURT:**  Only general causation.

3      So you're not trying to put together some sort of specific

4  causation testimony that would be general enough that it would

5  be applicable to multiple plaintiffs or something like that?

6          **MS. GREENWALD:**  No.  Just specifically only to general

7  causation, much like you heard a year -- I don't remember

8  whenever it was, whenever we had our original *Daubert*.

9          **THE COURT:**  What would be wrong with doing that, just

10  to sort of open up options for everybody involved?

11          **MR. STEKLOFF:**  Well, I think there are -- I mean,

12  first of all -- well, I won't start with this.

13      There are unavailability issues which, under the rules --

14  I mean, I understand we are preserving it in a hypothetical of

15  someone becoming unavailable, but I think that's a concern of

16  ours.  Second, I think you flagged that there are -- you know,

17  the science and the regulatory record is evolving, and so that

18  concerns us.

19      I mean, even the Portier deposition that we had from

20  Hardeman, which I saw in their paper, they suggested could be

21  used, I mean, it's outdated already.  And so I think -- I just

22  think it's an endeavor that -- now is not the time.  And I

23  think we are going to all have new -- I mean, we're seeing

24  other experts on both sides that are being disclosed, for

25  example, in the Missouri cases, and I expect here as well, that

are covering these general causation issues and other issues.

I'm not saying we won't also continue to see some -- you know, I expect we'll see Dr. Portier and others time and time again. But we just think now is not the time for that. And it is a huge use of resources when we have, I think, other priorities and other trials coming up.

**MS. GREENWALD:** But it also preserves resources in circumstances where there's back-to-back trials and there's availability issues.

I don't think any of us want to do anything that we're not going to use or that will be superfluous. Some circumstances would be very limited. It's a benefit to everybody.

And, again, the whole argument that Monsanto makes that maybe that particular testimony now isn't fair because there's just been a major study that changes everything, they would make that argument to the trial court and they would probably win.

**THE COURT:** I guess my gut on this is that it may be a good idea, but I wonder if you should all be focused more right now on working up this first wave of cases for summary judgment. And if we could revisit that, you know, in the fall, kind of after you filed all your summary judgment briefs and *Daubert* briefs and gotten your expert reports done and all that kind of stuff.

And maybe kind of the window while I'm considering -- I

1  mean, I know you all have a lot of stuff going on in other

2  cases too, but while I'm considering the summary judgment

3  motions and while you're waiting for me to decide those and

4  waiting for the cases to get remanded and sent back to their

5  home districts and waiting for the trial judges to set trial

6  dates in those cases and decide, maybe that would be the time

7  to do some preservation depositions.

8  　　　　MS. GREENWALD:  I think that's fair.  We're fine with

9  that.

10 　　　　MR. STEKLOFF:  Yes.  I mean --

11 　　　　THE COURT:  You still think --

12 　　　　MR. STEKLOFF:  That's my instinct, but I am very

13 comfortable with rediscussing it at that time.

14 　　　　THE COURT:  Okay.

15 　　　　MS. GREENWALD:  Thank you, Your Honor.

16 　　　　THE COURT:  So do we have a plan?

17 　　　　MS. GREENWALD:  We do.

18 　　　　THE COURT:  Is that it for today?

19 　　　　MR. STEKLOFF:  Yes.

20 　　　　THE COURT:  All right.  I'll think about the remand

21 stuff and issue an order.

22 　　　　MS. GREENWALD:  Thank you.

23 　　　　MR. STEKLOFF:  Thank you, Your Honor.

24 　　　　THE COURT:  Thank you.

25 　　　　(At 2:15 p.m. the proceedings were adjourned.)

## <u>CERTIFICATE OF REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Friday, May 24, 2019

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter